Hoagland *et al. v.* The New York, Chicago and St. Louis Railway Co.

No. 11,341.

111  443
159  344

HOAGLAND ·ET AL. *v.* THE NEW YORK, CHICAGO AND
ST. LOUIS RAILWAY COMPANY.

LEASE.—*Implied Covenant for Quiet Enjoyment.·—Landlord and Tenant.*—
A covenant for quiet enjoyment is implied in every mutual contract for
leasing land, by whatever form of words the agreement is made.

SAME.—*State Canal.—Lease of Use of Surplus Water.—Quiet Enjoyment.*—Un-
der a lease by the State of the use of so much of the surplus water, not
required for navigation, of the Wabash and Erie Canal as would be
sufficient to propel certain machinery in the lessee's mills, the implied
covenant for quiet enjoyment was such that, so long as the canal was
used for purposes of navigation, and while there was, during that
period, a surplus of water, the lessor agreed to do no acts which would
interrupt or deprive the lessee of its enjoyment.

SAME.—*Abandonment of Canal.—Appropriation to Other Uses.—Obstruction of
Channel.*—The contract in such case did not impose upon the lessor or
its grantees any obligation to keep the canal in repair, or to maintain
it in such a condition that a surplus of water would be available, or
to supply the lessee with any water, whatever, but the latter took the
lease subject to all the vicissitudes which might attend a public work
of that character, and to the right of the lessor or its grantees to aban-
don the canal for purposes of navigation and to appropriate it to other
uses, including the construction of a railroad on the line occupied by
it, thereby filling up the channel.

From the Allen Superior Court.

*L. M. Ninde,* for appellants.

*R. C. Bell,* for appellee.

MITCHELL, J.—Pliny Hoagland and Christian Tresselt
sued the New York, Chicago and St. Louis Railway Com-
pany to recover damages for obstructing the flow of water to
their mills.

The facts are, briefly, as follows : On the 29th day of No-
vember, 1842, the State of Indiana, having partially com-
pleted the Wabash and Erie Canal, made a lease of lots 24
and 25, in the original plat of the city of Fort Wayne, to Al-
len Hamilton and Jesse L. Williams, and in the same instru-
ment granted them the use of so much of the surplus water

of the Wabash and Erie Canal, not required for the purposes of navigation, as would be sufficient to propel three run of four and one-half feet millstones, for a term of thirty years. The lease contained a stipulation that it might be renewed, upon certain terms, for an additional term of thirty years. The lessees took possession under the first lease, and erected a flouring mill, which, with the appurtenances and other improvements made on the leased premises, is alleged to be of the value of forty thousand dollars.   Prior to the expiration of the first lease the State transferred its interest in the canal and appurtenances to a corporation created by an act of the General Assembly, known as the Board of Trustees of the Wabash and Erie Canal.   Pursuant to the provisions contained in the original lease, the board of trustees, on the 8th day of May, 1872, granted a new lease of substantially the same rights for the additional term of thirty years.   Hoagland and Tresselt are the owners of this last lease by assignment.   Neither of the leases contained any covenant to repair, nor was there any covenant for quiet enjoyment or for a continuation of the right to use the surplus water from the canal, except such as would be implied by law.   The right of the lessees to use water from the canal was made expressly subject to the right of the lessors to draw off the water, either wholly or partially, for the purpose of preventing or repairing breaks, or removing obstructions from the canal.   It was also stipulated that if the water should be drawn off for any of the purposes above named, or if the supply became inadequate, and the lessees should be wholly or partially deprived of water, a corresponding reduction should be made in the rent.   Under these leases the original lessees and their assigns continued to draw and use the surplus water from the canal until about the year 1882, when, it is alleged, the New York, Chicago and St. Louis Railway Company, having, so far as appears, lawfully acquired the equitable title to the canal and its appurtenances at the point where it traverses the city of Fort Wayne, and for some distance beyond, pro-

ceeded to construct its roadway and track on the line previously occupied by the canal, thereby filling up the channel of the canal, and causing the water to be obstructed to such an extent as practically to deprive the mill-owners of their power.

The railway company acquired its right to the canal in the manner following: The State, having become largely indebted through the construction of a system of public improvements which it had undertaken, transferred its interest in the canal to the board of trustees of the Wabash and Erie Canal on the 30th day of July, 1847. The board of trustees took the property in trust for the payment, out of the revenues to be derived from its operation, of certain bonds and interest coupons, which were accepted by creditors of the State in lieu of obligations previously owing to them by the latter. The revenues proved insufficient to meet the maturing obligations thus accepted, and the lien of the bondholders, which antedated the leases under which the mill-owners' rights accrued, was foreclosed. The canal and its appurtenances were sold under a decree of foreclosure. The railroad company acquired its right through mesne conveyances under this decree, the title having been conveyed to one Howard for its use. Prior to the acquisition of title by or for the use of the railroad company the canal had become dilapidated, and had fallen into disuse and decay, and had long before that been abandoned as a highway of commerce, or for any public or commercial purpose. The mill-owners had, however, regularly paid to the successive owners, prior to the railway company, the rents stipulated in the lease.

Upon the foregoing facts, the question arises, whether or not the railway company is liable to the owners of the mill for filling up the canal and obstructing the flow of water to their wheels.

The theory upon which the appellants' case proceeds is that, although the State and its grantees may not have incurred an affirmative obligation to keep the canal in repair, or to sup-

ply the lessees with water, the law, nevertheless, by implication, annexed to the lease a covenant for quiet enjoyment. The law having imported such a covenant into the lease, it is contended that the entering upon and filling up the bed of the canal, thus cutting off the flow of water upon the lessees' wheels, was an invasion of their right and a disturbance of their possession by the lessor, and, hence, such an act of aggression and wrong as renders the railway company liable for the resulting injury to their property.

That a covenant for quiet enjoyment, and that the landlord agrees to do no such acts as will destroy the beneficial use of the leased premises, is implied in every mutual contract for leasing land, by whatever form of words the agreement is made, is now too well settled to be doubted or shaken. *Avery* v. *Dougherty*, 102 Ind. 443 (52 Am. R. 680); *Smith* v. *Dodds*, 35 Ind. 452; *Wade* v. *Halligan*, 16 Ill. 507; *Streeter* v. *Streeter*, 43 Ill. 155; *Mack* v. *Patchin*, 42 N. Y. 167 (1 Am. R. 506); *Maule* v. *Ashmead*, 20 Pa. St. 482; *Eldred* v. *Leahy*, 31 Wis. 546; Wood Landlord and Tenant, 564.

The more serious question usually encountered, is that which relates to the measure of the lessee's damages when such a covenant is broken. Ordinarily, if the landlord takes possession or obstructs the tenant in the enjoyment of any material part of the demised premises, without the latter's consent, that will constitute in law an eviction of the tenant, and will operate to release him from any further liability to pay rent, even for so much of the leasehold as he may continue to occupy. *Mack* v. *Patchin, supra; Bentley* v. *Sill,* 35 Ill. 414; *Smith* v. *Wise,* 58 Ill. 141.

The measure of damages for the breach of a covenant for quiet enjoyment depends largely upon the nature of the estate or title granted, and the character of the landlord's default. The covenant always relates to, and never extends beyond, the interest, estate, or privilege granted. It is restrained and limited to the estate demised. Rawle Covenants (4th ed.), 199, 524.

The legal implication of the covenant is, that the land-lord has an adequate title to the estate created by the lease, and that he will permit the tenant to enjoy, without disturb-ance or interruption, the interest, title or privilege demised, subject to all such rights as are expressly, or by necessary im-plication, reserved to the lessor. It becomes important, there-fore, to inquire into the nature of the right or privilege granted to the lessees by the lease in question; and to ascer-tain the rights expressly or impliedly reserved to the lessor. The subject-matter of the lease was so much of the surplus water not required for navigation, to be taken by the lessees from the Wabash and Erie Canal, as should be adequate to propel a designated amount of machinery in their mills. The decisions of this and other courts establish beyond question, that the lessor, by the terms of the lease in question, assumed no obligation to maintain the canal in repair, or to keep it in such a condition as that a surplus of water above that needed for navigation should be available. The lease im-posed no obligation whatever to furnish or supply the lessees with water. It did nothing more than confer upon them the privilege of using the surplus water whenever and so long as there should be a surplus above that employed in navigation. Indeed, it is apparent from the face of the lease, that both parties contemplated that the supply of water might become partially or wholly inadequate. In the event of such a contingency, the lease made provision for a cor-responding reduction or suspension of rent. Both parties recognized the fact that the canal was constructed for the purpose of commerce. It was built for purposes of naviga-tion, and intended to be used primarily as a line of inter-communication. Neither party, at the time of the lease, apparently contemplated the abandonment of the canal for the purposes for which it was constructed. Hence, no pro-vision was made restricting the lessor from using all the water for purposes of navigation, nor from entirely abandon-ing the canal at pleasure, or requiring that it should be kept

in repair. The character of the work was such that the right of the State and its grantees to use all the water, or to abandon the enterprise entirely, was necessarily incident to the situation. By their lease, the lessees simply obtained the privilege of using for motive power at their mill wheels so much of the surplus water, passing through the canal, as was not necessary to carry out the primary purpose for which the work was constructed. The State and its grantees, who succeeded to its rights and liabilities, had the right to resume the use of all the water, or to abandon the canal entirely at pleasure. Whether they exercised the right of abandonment, or resumption, the effect upon the privilege granted to the lessees was the same. In neither event did the lessor become liable to any other consequence than the inability to collect rent from the lessees. *Hubbard* v. *City of Toledo,* 21 Ohio St. 379; *Fox* v. *Cincinnati,* 104 U. S. 783; *Sheets* v. *Selden,* 7 Wall. 416. As was in effect said by the court in *Fishback* v. *Woodruff,* 51 Ind. 102, the lessees took the lease subject to the use of the canal and to all the vicissitudes which might attend a public work of this character, such as dilapidation, destruction, abandonment. They could not suppose that the State or its grantees would keep up the canal for the purpose of furnishing them water-power if it became inexpedient to maintain it as a public work. It necessarily follows that the privilege granted to the lessees was at all times subject to two contingencies. The prime contingency was, that all the water flowing through the canal might be employed for the purposes of navigation; the other was, that the canal might become out of repair and be abandoned as a public work entirely. In either event, the privilege of the lessees was subordinate to the requirements of the public, or liable to be cut off entirely, unless by the mere grace of the State and its grantees. The covenant for quiet enjoyment, which the law annexed to the lease in controversy, was, therefore, such that so long as the canal was used for purposes of navigation, and while there was, during

MAY TERM, 1887.          449

Hoagland *et al.* *v.* The New York, Chicago and St. Louis Railway Co.

the period it was so used, a surplus of water above that which was required for navigation, the lessors agreed that they would do no such acts as would interrupt or deprive the lessees of its enjoyment.   This was the extent of the covenant, because the privilege granted, and to which the covenant related, extended no further.   So long, therefore, as the owners do no act in violation of this covenant they can not be liable for a breach of the covenant of quiet enjoyment.

The canal having been abandoned for purposes of navigation, possibly the grantees of the State, had they so elected, might have kept it in such a condition of repair as to have afforded water-power for mills and manufactories.   It is abundantly settled, however, that they were under no obligation to do so.   *Trustees, etc.,* v. *Brett,* 25 Ind. 409 ; *Skillen* v. *Water-Works Co.,* 49 Ind. 193 ; *Fishback* v. *Woodruff, supra;  Elevator Co.* v. *Cincinnati,* 30 Ohio St. 629 ; *Commonwealth* v. *Pennsylvania R. R. Co.,* 51 Pa. St. 351.

The question remains, had the State or its grantees the right to devote the canal and its bed to some other use, which would interrupt the flow of water,  or were they under obligation, having abandoned it for purposes of navigation, to permit it to remain idle and unoccupied ?

Having reached the conclusion that the lessors were not prohibited by the terms of the lease from using all the water in the canal, nor from abandoning it entirely for purposes of navigation, it necessarily follows that, in the absence of any contractual obligation, they had the right to appropriate the abandoned canal to any other use which they saw fit, if they could do so without invading or appropriating any of the lessees' property, which had lawfully been placed upon the lots appurtenant to the canal.

The appellants, impliedly at least, concede that the State and its grantees had the right to abandon the canal as a public work.   Having the right to abandon it for that purpose, it never could have been intended that the lease should de-

prive the owners of the property of the right to substitute another line or mode of transportation instead of that originally projected. To give the lease that effect would be to subordinate public interests to merely private convenience, the lessees, as we have seen, having acquired no continuing interest in the water of the canal.

The State invested its grantees successively with the same rights in the canal which it possessed when it transferred the work to the board of trustees. The trustees and their grantees acquired the rights of the State, and assumed its obligations, and none other. *Hubbard* v. *City of Toledo, supra.*

It would have been a barren security for the creditors of the State if they had been compelled to accept, in pledge of what the State owed them, a public work which had already proved unprofitable, and which they might abandon, but could never use for any other purpose, because certain leases of surplus water had been made. These leases, it must be remembered, too, were subordinate to the liens of the State's creditors. The lessees were, therefore, bound to take notice of the prior rights lawfully acquired at the time they took their leases. Those who acquired title under the pledge made by the State took all the rights of the State with precisely the same obligations as it owed in respect to outstanding leases.

The State, having come under no other covenant to the lessees except that it agreed not to interfere with their privilege of using the surplus water, not needed for navigation, so long as the canal was in operation for that purpose, had the right in the public interest to abandon the work or devote it to any other public use. Its grantees have the same right. *Commonwealth* v. *Pennsylvania R. R. Co., supra;* *Fox* v. *Cincinnati, supra.*

It does not appear that the railway company has invaded any of the appellants' property rights, or encroached upon the property leased, otherwise than by the obstruction of the canal. There is nothing in the cases of *French* v. *Gapen,* and

*Spears* v. *Gapen,* 105 U. S. 509, in conflict with what has been herein decided.

In one of those cases a contractor for the construction of certain portions of the canal was, by the terms of an agreement made with the State, to be paid for his work in water rents. It was held that the contractor acquired a property right in the rents of the water-power, which he rendered available; and that the State became a trustee to collect and pay the rents to him until his debt was liquidated. In the other, a valuable privilege of a mill-owner was rendered useless by the construction of the canal. The canal commissioners agreed, in consideration that the mill-owner would release all claims, awards and judgments in his favor against the State, that the State would supply him in lieu of his privilege so destroyed with a certain amount of the surplus water from the canal. It was held that when the State transferred the canal to the board of trustees, the latter took it subject to the prior obligation of the State to the contractor and mill-owner, respectively.

The conclusion at which we have arrived is that the appellee is not liable upon the facts stated, and as the court below arrived at a like conclusion, its judgment is affirmed, with costs.

ZOLLARS, J., did not participate in the decision of this cause.

Filed May 10, 1887.

## ON PETITION FOR A REHEARING.

ELLIOTT, J.—We have again examined the questions presented in this case, and we can find no reason for receding from our former opinion. It still seems clear to us, that the lease under which the appellants claim did not convey any other right than that to use the surplus water not required for the purposes of navigation. The changed circumstances of which counsel so often speak did not enlarge the subject

of the demise. The grantees of the State are not in a different position from that of their grantor, so far as respects the subject of the lease. That was not expanded by anything done by them or any one else. As said by the Supreme Court of Pennsylvania, in *Commonwealth* v. *Pennsylvania R. R. Co.*, 51 Pa. St. 351, "In determining the meaning of the contract, the subject of the grant is very material to be considered. It was surplus water."

When the canal was abandoned, there was no subject upon which the lease could operate, and it ceased to be effective. This result, as the decisions referred to in the original opinion clearly show, the lessor was not bound to prevent. There was no obligation, express or implied, that water should always be supplied, nor that the canal should be so maintained as that the lease should remain operative. On the contrary, the clear implication is, that when the subject of the lease ceased to exist, the rights of the parties under it terminated fully and completely. If this be true, and we can see no reason for doubt, then it must be true that the State or its grantees had a right to do with the canal property what any owner might do. This is substantially the doctrine of *Fox* v. *Cincinnati*, 104 U. S. 783, where it was said, in speaking of the canal: "When it was no longer needed, it might be abandoned; and, if abandoned, the water might be withdrawn altogether."

The appellants did not acquire any corporeal property; all that they acquired was an incorporeal right. Their right was to use the water, for they did not acquire any right to the *corpus* of the water, much less to any of the land. Angell Watercourses, section 90. The incorporeal right which they acquired was to the use of the surplus water, and when the abandonment of the canal for the purposes of navigation made it impossible that there should be surplus water, the incorporeal property which formed the subject of the lease ceased to exist. If the subject of the lease—that is, the incorporeal right to the use of the surplus water—ceased to exist

when the canal was abandoned, then the appellants had no longer any right in the canal or its appurtenances, because the only property on which their lease could operate was gone.

Petition overruled.

Filed Oct. 18, 1887.