Cushing, J.
The original action in the court of common pleas was brought by a taxpayer to enjoin the rapid transit commission of the city of Cincinnati from paying $60,483 to The Atkins & Pearce Manufacturing Company, Carrie M. Fagin and the Kilgour estate.
The city and the rapid transit commissioners, The Atkins & Pearce Manufacturing Company, Carrie M. Fagin and the Kilgour estate are plaintiffs in error. In this opinion The Atkins & Pearce Manufacturing Company, Carrie M. Fagin and the Kilgour estate will be referred to as plaintiffs in error.
Plaintiffs in error claim the right to the money in question on two grounds, first, that they have a vested right to the flow of surplus water, as hereinafter described; and, second, that the city and the rapid transit commission entered into a contract of settlement with them and they are now claiming the money by contract.
Plaintiffs in error claim that on March 26, 1836, the state entered into a contract in writing by which it agreed to sell or lease to Clark Williams, subject only to the restrictions, limitations and conditions therein provided, for ninety-nine years, renewable forever, the surplus water for milling purposes owned by the state at the locks of the Miami and Erie canal, east and south of the east side of Broadway in the city of Cincinnati, and that they are the successors in title to Clark Williams in the right to such surplus water. At the time the lease was entered into the canal extended from north of the *142 city of Cincinnati to the Ohio river. Between the east side of Broadway and the Ohio river there were at that time nine looks.
On April 28, 1863, pursuant to an act of the general assembly, passed March 24, 1863 (60 O. L., 44), the city entered upon, occupied and improved, for street and sewer purposes, that part of the canal from the east side of Broadway to the Ohio river. One of the considerations for the grant was that the city was required to, and did construct, under what has since been known as Eggleston Avenue, an aque - duct, as an outlet for the surplus water of the Canal north and west of the east side of Broadway.
After the completion of the aqueduct it was accepted, occupied and used by the state for its purposes until about October 22, 1919.
As a part of the improvement, the city constructed a sewer under Eggleston avenue, filled in the canal, and used the surface for street purposes. The state used the canal west and north of Broadway for transportation purposes, and the aqueduct under Eggleston avenue as an outlet for the surplus water in the canal.
On May 15, 1911 (102 0. L., 168), the general assembly passed an act authorizing the governor of the state to enter into a contract of lease with the city for the part of the canal commencing at the east side of Broadway and extending west and north thereof to a point 300 feet north of Mitchell avenue. The statute authorized the city to use that part of the canal for street, sewerage, boulevard and subway purposes, and as a part of the consideration for the grant the city was obliged to construct an outlet for the surplus water of the canal at a point several miles north of the east side of Broadway, *143 by which the surplus water in the part of the canal not abandoned was to be turned into Millcreek. The outlet was constructed. The city entered upon the part of the canal so abandoned, and since that time no water has passed through the aqueduct.
The canal was constructed by the state for transportation purposes. Clark Williams’ lease, or license, was only for the use of the surplus water, for milling purposes, that passed the locks in the part of the canal abandoned by the act of 1863. c-!
For the purpose of clarity it is conceded by the parties to this action that neither Clark Williams? nor any person claiming under him, acquired or had any right to such surplus water that could not be terminated by the state at will; that the state in leasing or abandoning the canal might create such restrictions, conditions and reservations as its discretion dictated; and that such restrictions, conditions and reservations must be stated in the act authorizing the lease, and, if not so stated, do not exist. Hubbard v. Toledo, 21 Ohio St., 379; Little Miami Elevator Co. v. City of Cincinnati, 30 Ohio St., 629, and Fox v. City of Cincinnati, 33 Ohio St., 492.
It is claimed by plaintiffs in error that by the act of 1863 they acquired as against the city a vested right in and to the use of the surplus water in the canal, and to have it pass through the aqueduct.
The act of 1863 gave the city the right to use the land owned by the state and occupied by the canal for but two purposes, the surface for street purposes, and so much of the part below the surface as was necessary for a sewer. The city at no time owned, used or controlled the locks, the aqueduct in question, or the surplus water that might pass through the aqueduct from that part of the canal *144 not abandoned. In tbe absence of any ownership in or control over the aqueduct or the surplus water from the canal, a vested right as against the city could not arise either from grant or by prescription.
The claim to a vested right by statute can be determined only from a consideration of the act itself.
The act of 1863 has been before the supreme court in several cases. The reasoning of that court in the case of Fox v. City of Cincinnati, supra, settles the question of vested rights under the act. It was held that when the state exercised its reserve right to abandon the canal, and thus cut off permanently the supply of water, there was no right to damages against the state, nor was any liability imposed on the city by accepting the grant. A right or claim that did not subsist against the state could not accrue against the city. Therefore, the plaintiffs in error must rely upon their lease of 1836, and the reservations in the act of 1911 as a basis for their claim, and if none exists they must fail in this action.
The act of 1911 (102 O. L., 168) authorizing the lease to the city specifically provided for the construction of an outlet for the surplus water in the remaining part of the canal, as above stated, several miles north of the east side of Broadway. The act of 1911 contained three conditions, a general provision that the city should protect outstanding rights or claims, if any, and two special conditions that will hereinafter be considered.
Adhering to the rule of construction that in case of a conflict or inconsistency between general and special provisions, reservations or conditions of an act of the general assembly, the special will control pr modify the general reservations and conditions, *145 we come to a consideration of the act of May 15, 1911.
The general condition in that act is stated in the language used in the act of March 24, 1863 ( 60 0. L., 44), as follows:
“Subject to all outstanding rights or claims, if any, with which it may conflict.”
This provision was before the supreme court in the ease of Hubbard v. Toledo, supra. In that case the court reached the conclusion that the lease, so called, was a mere license to take, and not an obligation on the part of the state to furnish surplus water.
Another rule of construction is that where the provisions of a statute have been ascertained and made definite by judicial construction in using the same language in a subsequent act, it will be presumed that the general assembly intended to use the language in the same sense, unless enlarged or restricted by the context of the act. We do not find in this act any provision that would warrant us In giving a different construction to the language from that stated by the supreme court.
The two special conditions in Section 2 of the act obligated the city to construct an outlet for the surplus water of the canal, and to construct proper works, so that the state could carry out its contracts with the users of water along the portion of the canal to be abandoned.
The provision with reference to the construction of the outlet is that the city shall construct a suitable and sufficient outlet for the water in the canal at a point 300 feet north of Mitchell, avenue, so as not to obstruct the flow of water through the remaining part of the canal, or destroy or injure the present supply of water for mechanical or commercial *146 purposes. In answer to the contention of plaintiffs in error that this language secures to them a continuation of the flow of surplus water through the aqueduct east and south of the east side of Broadway, it should be observed that the first paragraph of Section 2 of the act relates only to the construction of an outlet for the water in the canal. That part of the act relates to the manner in which the outlet shall be constructed — it shall be suitable and sufficient, and it shall not interfere with the supply of water for mechanical or commercial purposes in the part of the canal not abandoned. The location of the phrase, the subject-matter with which the general assembly was dealing, as well as the punctuation, all tend to the conclusion that it was the water in the part of the canal north of Mitchell avenue.
The reservations and conditions imposed with reference to the part of the canal to be abandoned were treated separately. This provision had to do with the water in the canal, and not with the surplus water that had theretofore passed through the aqueduct, in which plaintiffs in error claim a property right. The language used in the act is:
“Said city shall adopt and construct appropriate works for the purpose of supplying water to the lessee users of said water along that portion of the canal to be abandoned, in order to and for the purpose of enabling the state to fully carry out and discharge the obligations now resting upon it by virtue of certain contracts now subsisting and in force between it and said lessee water users.”
The plain import of this provision is that the appropriate works were to be constructed for and used by the state in the discharge of its obligations to the persons or firms with which it had contracts. *147 The state has not, and we assume that it will not, require the city to construct such works, as it is admitted that all the leases along the part of the canal to be abandoned have expired. The argument that this provision of the act was intended to apply to and protect the water users along the aqueduct east and south of the east side of Broadway is not tenable. The construction of the outlet north of Mitchell avenue, and its use by the state, were an abandonment of the aqueduct east and south of the east side of Broadway for all purposes.
The conclusion is that the language of the act, “the part of the canal to be abandoned,” referred only to the part between the east side of Broadway and the point 300 feet north of Mitchell avenue, and that the plaintiffs in error have no claim against the state or city on account of the abandonment by the state of the aqueduct.
The remaining contention of plaintiffs in error is that they presented to the rapid transit commission claims for damages against the city for a diversion of the surplus water in the canal, aggregating about $152,000, and that some time in October, 1919, they and the commission entered into a contract by which it was agreed that the city should pay them the sum of $60,483, in full settlement of their loss or damage, and that having entered into that contract they have a binding claim against the city for such sum.
We have already determined that the plaintiffs in error did not have a claim against the city, and it is difficult to understand what consideration there was for the payment of so large a sum of money in settlement of an alleged claim or right.
The other question growing out of this contention is, Did the rapid transit commission have authority *148 to enter into such a contract? The commission was organized pursuant to the authority given by an act of the general assembly passed May 17, 1915 (106 O. L., 286). Its authority to acquire property was contained in the following provision of that act:
“The board of rapid transit commissioners is hereby given power to acquire by purchase or to appropriate, enter upon and hold any real estate or casement, partial or otherwise, therein, thereon, thereunder, or thereover, or any interests therein, both within and without the limits of the municipality, which it deems necessary for the purposes above specified; such power to be exercised in the manner provided by law for the acquisition and appropriation of property by municipal corporations.”
It is contended that the language “is hereby given power to acquire by purchase” is broad enough to authorize the commission to enter into this contract of settlement. Two cases are cited in support of this contention, Springfield v. Walker, 42 Ohio St., 543, and New Orleans v. L. & N. Rd. Co., 109 U. S., 221.
The law of Ohio is that statutes conferring authority on municipalities, boards and commissions are to be strictly construed. The cases cited are, in our opinion, not applicable here.
In the case of Springfield v. Walker, Walker had commenced an action in the court of common pleas of Clark county against the city of Springfield to recover damages for personal injuries caused, as it was alleged, by the negligence of the city. Before the ease was for trial, the city and Walker entered into a statutory arbitration under the direction and supervision of the court of common pleas. The award of the arbitrators was returned into court, *149 and the court entered a judgment thereon. The city excepted to the judgment and prosecuted error to the supreme court. The claim was made that the city was not a “person” within the purview of the statute authorizing arbitrations. The judgment of the court of common pleas was affirmed. The agreement of arbitration was made pursuant to authority in the statute. This was not a settlement between the parties, and the court held that the word “person” used in the act authorizing arbitration was broad enough to include a municipality.
In the case of New Orleans v. L. & N. Rd. Co., the board of liquidation of debts of the city of New Orleans was specially authorized by the act creating the board to dispose of the property in question on such terms and conditions as may be deemed favorable. Construing that statute the supreme court of the United States held that under the act in question the board was vested with authority to sell the property. No such authority is found in the act creating the rapid transit commission. That act limits the powers of the commission in the following language, “such power to be exercised in the manner provided by law for the acquisition and appropriation of property by municipal corporations.” Part first, Title Nil, Division III, Chapter I of the General Code sets out in detail the steps to be taken in the acquisition or appropriation of property by municipalities of the state. Whether the claim for damages arises from the taking of property or the appropriation of the property right, neither the rapid transit commission nor the city followed the provisions of Sections 3681 and 3689, General Code, in determining whether or not the plaintiffs in error had a property right, and, if so, its value.
*150 The conclusion is that the plaintiffs in error did not have a vested right as against the city to have the surplus water of the canal pass through the aqueduct east and south of the east side of Broadway, nor have they any claim for damages against the city growing out of the abandonment of the aqueduct by the state; that there was no consideration for the alleged contract under which plaintiffs in error claim the sum of $60,483, and that the rapid transit commission did not have authority to enter into such a contract.
The judgment of the court below will, therefore, be affirmed.

Judgment affirmed.

Hamilton, P. J., and Btjchwalter, J., concur.