## MAUMEE VALLEY ELECTRIC CO. v. CITY OF TOLEDO et al.

(Circuit Court of Appeals, Sixth Circuit. May 14, 1926.)

No. 4483.

1. **Canals ⊛⟹20—Under conveyance to city of portion of canal, city held obligated to respect water rights held under lease, with no power to interfere, except on payment of compensation (Act Feb. 4, 1920 [108 Ohio Laws, pt. 2, p. 1138]; Page & A. Gen. Code Ohio, §§ 14009, 14012).**

Under conveyance of portion of canal to city under Act Feb. 4, 1920 (108 Ohio Laws, pt. 2, p. 1138), expressly excepting from conveyance all rights of owners of existing leases of either land or water, city became obligated to respect and protect water rights granted under authority of Page & A. Gen. Code Ohio, pp. 14009–14012, precluding city from interfering with use of water during terms of leases, except on payment of compensation as provided in act authorizing conveyance.

2. **Canals ⊛⟹20.**

State Legislature, in authorizing conveyance to city of portion of canal by Act Feb. 4, 1920 (108 Ohio Laws, pt. 2, p. 1138), had power to impose conditions requiring protection of rights under existing water leases.

3. **Contracts ⊛⟹187(1).**

One for whose benefit a promise is made may enforce performance in equity.

4. **Canals ⊛⟹20—City, accepting deed of portion of canal on condition that it respect rights of holders of leases, held equitably estopped from repudiating obligations assumed (Act Feb. 4, 1920 [108 Ohio Laws, pt. 2, p. 1138]).**

Where city accepted deed of portion of canal from state under Act Feb. 4, 1920 (108 Ohio Laws pt. 2, p. 1138), on condition that rights of holders of leases would be respected, *held*, that city was equitably estopped from repudiating obligations assumed thereby, even though state could have lawfully terminated such water rights by abandonment of canal for navigation purposes.

**5. Canals ⬗28—Lessee of water rights in canal held entitled to renewal after state's conveyance of portion of canal to city, and effectiveness of election to renew was not affected because state declined to receive rentals (Act Feb. 4, 1920 [108 Ohio Laws, pt. 2, p. 1138]).**

Where lease of right to water of canal granted right of renewal unless other bidder should increase rent, *held* that, after conveyance by state to city under Act Feb. 4, 1920 (108 Ohio Laws, pt. 2, p. 1138), expressly reserving rights of owners of water rights and rights of renewal, lessee had legal right to renewal, where there was no other bidder, and where application had properly been made for renewal with tender of rentals to state, validity and effectiveness of election to renew were not affected by state's refusal to receive rentals tendered.

Appeal from the District Court of the United States for the Western Division of the Northern District of Ohio; John M. Killits, Judge.

Bill by the Maumee Valley Electric Company against the City of Toledo and others. Decree dismissing the bill, and plaintiff appeals. Reversed and remanded, with directions.

U. G. Denman, of Toledo, Ohio, and Karl E. Burr, of Columbus, Ohio (Denman, Miller & Wall and Elmer E. Davis, all of Toledo, Ohio, on the brief), for appellant.

Martin S. Dodd and F. M. Dotson, both of Toledo, Ohio, for appellees.

Before DONAHUE, MOORMAN, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This appeal grows out of the following state of facts:

The Miami & Erie Canal, constructed by the state of Ohio (as part of its system of public navigable canals), and completed by the year 1845, extended from Cincinnati northerly to and through Defiance; thence northeasterly along the Maumee river, into and through the city of Toledo, to Lake Erie. The part of the canal involved in this case lies on the northerly side of the Maumee river, and extends a distance of about 18 miles northerly from Providence (just below the state dam at Grand Rapids, Ohio) to lock 45, which is just northerly from appellant's plant, and thence on and into the city of Toledo, and to a point near the mill of the Toledo Grain & Milling Company, where the canal ends. Appellant is a corporation organized under the laws of Ohio, for the purpose of generating electricity and supplying it to the public for heat, light, and power. Its plant lies on the south side of the canal at Maumee, between the canal and the river.

By the Act of February 8, 1830, express authority was given the canal commissioners to sell, from time to time, for hydraulic purposes, subject to such conditions and reservations as the commissioners might deem necessary and proper, either in perpetuity or for a term of years, for an annual rent or otherwise, as deemed for the best interests of the state, the surplus water in either of the canals above the quantity required for purposes of navigation; water passing around the locks being included in the term "surplus water." Every lease, grant, or conveyance of water was required to contain a "reservation and condition" whereby the state could at any time resume the "privilege or right" to the use of the water in whole or in part, *whenever deemed necessary for purposes of navigation, or whenever its use for hydraulic purposes should be found in any way to interfere with and injuriously affect the navigation of either of the canals, feeders, or streams from which water was being taken for hydraulic purposes;* in the event of which resumption in whole or in part the sum paid by the grantee or the rent reserved, in whole or in reasonable part, should be "refunded or remitted to the purchaser or lessee, his heirs or assigns." These provisions were carried into the Act of March 23, 1840, now found in sections 14009 to 14012, inclusive, of Page & Adams, O. G. C. of 1910.[1]

Plaintiff is the owner of six water leases given by the state officers under due legislative authority therefor. The first and most important is known as the Law lease granted in 1895 for a period of 30 years from March 12th of that year, entitling the lessee to all the surplus water flowing in the canal between the village of Providence and the state dam in Lucas county, Ohio, and the city of Toledo, *not needed for navigation* and not under lease to other parties—such leased water to be taken from the canal at the village of Maumee. It called for an annual rental of $500 and gave right of renewal for

---

[1] A previous statute passed in 1828 had provided that whenever in the opinion of the board of canal commissioners any water may be spared from any state canal or works connected therewith without injury to navigation or safety of such canal, the board might order a sale of such surplus water for a term of years in their discretion to the person who should bid the highest annual rent therefor, provided the same should not in any wise interfere with the rights of individuals. But even before this statute, and in pursuance of an apparent public policy, the commissioners leased or sold surplus water *for hydraulic purposes.*

30 years from March 12, 1895.[2] This lease was assigned to plaintiff September 11, 1900, by the consent and permission of the board of public works. Plaintiff has paid in full all rentals accruing under this lease, and, as hereinafter more fully shown, has taken advantage of the renewal privilege. In the year 1902, although *public navigation* upon the portion of the canal in question *had already ceased*, the General Assembly of the state of Ohio declared it the settled policy of the state that the Miami & Erie Canal, together with its *water supplies*, reservoirs, dams, feeders, and adjacent lands, from Cincinnati to Toledo, should be retained and maintained as a public canal.

Thereafter plaintiff, with the consent and approval of the state of Ohio, acquired four other leases of water (all apparently to be taken from the canal level in question), given at various dates between the years 1901 and 1906, calling respectively for amounts ranging from 833 to 2,100 cubic feet of water per minute, the estimated horse power therefrom ranging respectively from 47 to 58, and at rentals ranging from $300 to $450 per year. Each of these leases ran for 30 years from its date, and each contained the 30-year renewal right, as in the case of the Law lease. None of these four leases has yet expired. On December 14, 1910, the state entered into a lease and agreement with plaintiff supplementary to the Law lease,[3] whereby plaintiff agreed to and did, at its own expense, remove rock bars and other obstructions in the canal, and deepened and widened the same throughout the 18-mile section referred to, from Providence to Lock 45, thereby materially increasing the amount of water which the canal could supply.[4]

By this supplementary agreement the water rent was greatly increased,[5] and in addition appellant was required to bear the expense of keeping the banks of the canal in good repair throughout the 18-mile section, and to pay the expense of daily service of three patrolmen of the canal.

Plaintiff's disbursements for the removal of obstructions and deepening and widening the canal were about $53,000. The increased rentals provided by the supplemental lease, as well as the expense of patrolling the banks, has been regularly and fully paid by plaintiff. Since 1911 plaintiff has greatly increased the capacity of its plant at Maumee, enlarging its buildings, installing new and larger water wheels and electric machinery, with auxiliary steam plant to assist in generating electricity in the dry seasons, when the water supply was insufficient. Its plant is worth several hundred thousand dollars, a large part of which value would be lost to plaintiff, if deprived of the water power in question. By virtue of the leases referred to plaintiff is entitled normally to receive 422 out of the 536 cubic feet per second reaching its plant at Maumee; the remaining 114 cubic feet going past plaintiff's flume.

On January 22, 1920, the General Assembly of the state of Ohio (108 O. L. pt. 2, p. 1138) declared the abandonment for both canal and hydraulic purposes (*"subject, however* to the rights hereinafter under sections 6 and 7 provided for"*) of that portion of the canal extending from the north end thereof, in the city of Toledo (the canal outlet), and extending south a distance of 8.85 miles, to a point just north of what is known as the Maumee side cut, and 1.6 miles southerly from plaintiff's plant, thus including the portion of the canal from which plaintiff takes its water power. By the same act authority was given for the sale of such abandoned section of canal to the city of Toledo, at a price to be determined by appraisement, subsequently fixed at $300,000. The exceptions in sections 6 and 7 of the legislative act are these: The provision for deed "conveying said property in fee simple

---

[2] The lessee was also to "keep constantly in good order and repair the weir, head and tail race, and all other works and devices connected with the use of the water hereby leased; so far as the same shall be necessary to secure the regular and uniform flow of water from the upper to the lower levels, and also to prevent any breach in the bank, the formation of a bar or other injury to the canal, or impediment to the navigation thereof."

[3] The supplementary lease in terms recognized that the service included in the Law lease was unsatisfactory, and the compensation provided thereby inadequate for a proper and satisfactory service.

[4] The state agreed to let into this 18 mile canal level "waters of Maumee river equal to safe capacity of said canal for use for hydraulic purposes at the works of company located near Maumee, and to cause a large, steady, and even flow of such water as may be practicable, except in cases of unavoidable accident or public necessity, all consistent with the rights of navigation of said canal," the state further sell-

ing and leasing to plaintiff "all the increased water passing over the weir" of plaintiff "provided for by this agreement."

[5] Absolutely from the original $500 to $2,000 per year, plus $375 for each three months of continuous hydraulic service rendered by the state to plaintiff during which time a flow of water to the depth of six inches over the top of plaintiff's weirs should be maintained without interruption continuing longer than six consecutive hours.

to the city of Toledo," etc., is followed by the words: *"But excepting therefrom and subject to the rights of owners of existing leases of either lands or water or both, and the rights of said owners to a renewal of said existing leases."*

Section 7 of *the act* contains this further express provision: *"In case the state's lessees are* at any time, under the terms of this act, *deprived of their water privileges,* the city of Toledo *shall pay such lessees a fair compensation for the loss of the water to which they are entitled,* and in case the amount of compensation cannot mutually be agreed upon, the city of Toledo shall proceed under the provisions of the General Code, *to condemn the rights of such lessees* for the use of said municipality: Provided, however, that no new leases shall be executed for either water or land rights upon any portion of the canal property described in section one hereof during the three-year period referred to in section 5 hereof:[6] And provided further, that this act shall not be construed as granting the lessees any rights in addition to those granted them in their existing leases." [7] Section 8, immediately following the provision of section 7 just quoted, is given in the margin.[8]

In the *deed* from the state to the city of Toledo (made pursuant to this legislation, and containing reference thereto as providing for the sale in question "upon the terms in said act and deed set forth") the description of the property conveyed was followed by these words: *"Excepting therefrom and subject to the rights of owners of existing leases of either lands or water, or both, and excepting therefrom and subject to the rights of said owners to a renewal of said existing leases."* The *habendum* clause of the deed reads thus: "To have and to hold said prem- ises *as fully and completely and subject to all such conditions and restrictions as the state of Ohio might or should convey the said premises by virtue of the provisions of the aforesaid act of the General Assembly of Ohio."* At the time of the purchase by the city of Toledo of the section of canal in question the city was aware of plaintiff's alleged water rights under its leases here in question.

Ever since the receipt of the conveyance from the state the city of Toledo has refused to recognize any rights on the part of plaintiff in the canal water under its leases or otherwise, and against the protests of the plaintiff. On March 19, 1925, its council, by formal resolution directed the superintendent of public works to at once cut off the flow of the water of the canal at the southerly end of the portion acquired from the state and through the sidecut referred to, and to construct bulkheads, embankments, etc., necessary to divert the flow of the water into the Maumee river. Such action would completely destroy plaintiff's water rights. The city has not offered, and does not intend, to pay plaintiff any compensation for the proposed destruction of its water rights. The bill of complaint, seeking permanent injunction against the city's threatened action, was filed immediately following this resolution of the city council. A temporary injunction was granted. On final hearing the bill was dismissed. This appeal is from that dismissal. An injunction preserves the status quo pending appeal.

Broadly stated, the city's defense is this: (a) Plaintiff's leases were only for surplus water, not needed for navigation purposes; (b) the state had power at any time to abandon the canal for purposes of navigation, and the act of 1920 worked such abandon-

---

[6] The city was given three years in which to determine whether to buy or lease the canal strip in question.

[7] In section 7 the exception in section 6 above quoted was made to apply to a lease, if given the city, instead of a deed.

[8] "Prior to the execution of any deed or lease conveying to the said city of Toledo the lands herein described the city of Toledo shall enter into a contract with the state of Ohio, which contract shall be executed on the part of the state of Ohio by the Governor and Attorney General; that the said city of Toledo shall provide the right of way and construct a channel with suitable locks, to connect the Miami & Erie Canal with the Maumee river on such alignment, near Maumee City, as the superintendent of public works of the state of Ohio may designate, said connecting channel and locks to be completed within two years from the date of notification to said city of Toledo, by the superintendent of public works requesting that said improvements be made, but such request shall not be made until the state of Ohio, its lessees or assigns, or the federal government of the United States, have arranged for the resumption of navigation in the existing canal upon a scale to justify the expenditure of the money required for making such connecting channel; the city of Toledo, however, shall construct all bulkheads or embankments necessary to cut off the flow of water at or near the southerly end of the canal herein abandoned, and likewise construct all overflow waste weirs and necessary channels required to care for the surplus water that must be wasted at some point near the Maumee sidecut; all of which work must be done to the full satisfaction of the superintendent of public works, and in accordance with plans to be approved by him prior to the commencement of the work."

ment; (c) there then remained no such thing as surplus water; (d) the state had no right, after abandonment for navigation purposes, to maintain the canal at public expense for commercially supplying water for hydraulic purposes, and thus could not be required so to do; (e) the city therefore incurred through the abandonment no liability to plaintiff for the destruction of its water rights; (f) by the act of 1920 the city merely stepped into the shoes of the state, and, the latter not being pecuniarily liable to plaintiff, the city was by the same token absolved, notwithstanding the language of the act and of the conveyances thereunder.

The abstract propositions numbered (a), (b), and (c), supra, as there generally stated, were applied to the facts existing in Hubbard v. Toledo, 21 Ohio St. 379; Elevator Co. v. Cincinnati, 30 Ohio St. 629, 643; Fox v. Cincinnati, 33 Ohio St. 492; Id., 104 U. S. 783, 26 L. Ed. 928; Cincinnati v. Rogers, 16 Ohio App. 139; Kaukauna Co. v. Green Bay, etc., Canal, 142 U. S. 254, 274, 12 S. Ct. 173, 35 L. Ed. 1004; and in denial of right of action by lessees of "surplus" water, because of abandonment by the state of one portion or another of the Miami & Erie Canal for navigation purposes.

In the view we take of the instant case, it is unnecessary to decide whether the general proposition of law stated in paragraph (d) above applies under the special conditions existing here, including the Law lease and the agreement supplemental thereto, the fact that public navigation of the canal level in question had already ceased before 1910, that for many years, by virtue of the Law lease and supplemental agreement, the state had been and was still being relieved of all expense of upkeep of the canal, that the use of water for hydraulic purposes did not interfere with navigation, and that by the supplemental agreement the state expressly sold and leased to plaintiff "all the increased water passing through" plaintiff's weir. We find it unnecessary to say more in that regard than that the case of State v. Middletown Hydraulic Co., 151 N. E. 653, decided by the Supreme Court of Ohio since the argument of the instant case in this court, seems to lend substantial support to the proposition that the state had power to continue to keep up the canal and to carry out its existing contracts with plaintiff, under the special and peculiar conditions prevailing, notwithstanding the abandonment of the canal for navigation purposes.

[1] But assuming, for the purposes of this case, that plaintiff could not prevent the cutting off by the state of plaintiff's water privileges, even though the state was being put to no expense for maintaining the canal, and that the state was under no legal liability to plaintiff for such sale to the city, we are wholly unable to assent to the proposition that by the act of 1920 the city merely stepped into the shoes of the state so far as concerns the recognition and protection of plaintiff's rights and equities. On the contrary, we think it clear that through the legislative act in question, and the conveyance thereunder to the city of Toledo, the latter became obligated to respect and protect plaintiff's water rights and privileges as they were being enjoyed at the time of the act of abandonment; in other words, that the city had no right or power to interfere with plaintiff's use of the water, to the extent to which plaintiff was then using the same, during the remainder of the respective terms of its leases and during the renewals thereof provided for therein, except upon payment of compensation therefor, either by voluntary agreement or, failing that, by statutory condemnation.

In our opinion, none of the cases relied upon by the city support its contention in the respect we are now considering. In Hubbard v. Toledo, supra, the action was at law, by a holder of a lease for surplus water, given in 1842. The act authorizing sale to the city of Toledo was passed March 26, 1864 (61 Ohio Laws, p. 67). There were also outstanding leases of the "*public works*," given pursuant to the legislative act of May 8, 1861 (58 Ohio Laws, p. 117). The only provision in the Act of March 26, 1864, imposing liability on the city which we think call for mention were "that the grant shall be subject to all outstanding *rights* or *claims, if any*, with which it may conflict * * * that the said city shall be liable for all *damages that may accrue from the vacation of said canal;* but it is not intended hereby to relieve the lessees of said canal, or their assigns from any responsibilities imposed upon them by an act to provide for the leasing of the public works of the state, passed May 8, 1861, or by the instrument of lease executed in pursuance of said act, except as and to the extent that they may be interfered with as said city may enter upon and occupy said grant," and that "the city council of said city * * * deposit with" the Governor "a written release, executed by the lessees of the public works, relinquishing any rights they may have in that part of said canal, *or* a bond duly executed, and to the satisfaction of the Governor, indemnifying

the state from all *liabilities and damages* which may result from said *vacation.*" [9]

The city gave to the state the indemnifying bond called for. The question of the city's obligation to the plaintiff was held to be one of legislative intent.

The conclusion that by the act there in question the Legislature did not intend to impose upon the city liability for damages *to the plaintiff* was based upon the consideration that the words "*if any,*" following the words "rights or claims," were thought by the court to contemplate "rights and claims" of *possible* existence against the state, with which the abandonment of the canal might conflict, and, for which legal demand might be preferred against the state, and which thus would not naturally include plaintiff's claim; the facts that the act attempted to protect *one class* of claimants (the lessees of the public works); that such lessees were in actual possession of the canal under the act of 1861, and could not be divested of their property without impairing the obligations of their contract; that the requirements of written relinquishment and of indemnity bond were in the alternative, and related only to lessees of the "public works"—thus suggesting that leases of the latter class were the only ones intended to be protected; "the studied omission of the state to mention plaintiff's lease as a subject-matter to be protected, although it could as readily have been done as the lease of the public works;" and the improbability of a legislative intent "by the employment of general language" to make the city "liable for consequential damages for which no legal demand could accrue against the state, and hence no motive could exist for casting it upon the state."

In Elevator Company v. Cincinnati, supra, the state, under the act of 1861, had leased *the canal*, reserving the right to grant to the city permission to enter upon a certain part of the canal in Cincinnati as a public highway and for sewerage purposes. By act of March 24, 1863 (60 Ohio Laws, p 44), the state exercised this reserved right. In 1869 the state and the lessees of *the canal* conveyed to plaintiff the water power at a certain point. The action was at law by the owner of the 1869 lease. It was held that the reservations and conditions annexed to the grant to the city were not intended to reserve to the state nor to the lessees of the public works the right, after that part of the canal had been abandoned, and after the title had vested in the city and it was in pos-

session, engaged in making the intended improvements according to an approved plan, to *create new rights not theretofore existing*. To say the least, this case contains nothing more favorable to the city than found in the Hubbard Case. Here again the question of plaintiff's rights was made to depend upon legislative intent.

Fox v. Cincinnati, supra, gives even less support to the city's claim. This case also was at law, and arose under the Act of March 24, 1863, involved in Elevator Co. v. Cincinnati, supra. Plaintiff was using no power, his mill had burned several years before the act and deed involved, and he had paid no rent for several years.

In Cincinnati v. Rogers, supra, the review involved a claim for damages by a lessee of surplus water (under lease made in 1836), of whose use claimants were deprived by means of an aqueduct built by the city of Cincinnati under the Act of March 24, 1863, which contained the general condition as in the Hubbard Case—"subject to all outstanding rights and claims, *if any,* with which it might conflict." Here again the question of intent was involved. The case is certainly no more favorable to the city than is the Hubbard Case.

In the instant case the protective terms of the legislative act, and the conveyance thereunder, are in sharp contrast with those in each of the prior cases we have considered. By section 6 of the act of 1920, the deed is not, as in the Hubbard Case, to be merely "subject to all outstanding claims, if any, with which it may conflict." It is not only to be subject to all the rights of owners of existing leases of either lands or water, or both, * * *" but such rights of owners of existing leases are excepted from such deed, and all idea that the city was merely to indemnify the state on account of such damages as the latter should be legally subject to was, we think, plainly and effectually repelled by the express provision that, "in case the state's lessees are at any time, under the terms of this act, deprived of their water privileges, the city of Toledo shall pay such lessees a fair compensation for the loss of the water to which they are entitled," with provision for condemnation in case the amount of compensation cannot mutually be agreed upon.

We think this interpretation not impaired by the words "to which they are entitled," which, considered in connection with the context, can, we think, reasonably mean only "which their leases call for." Nor do we think our conclusion affected by the pro-

---

[9] The italics in the above quotation are ours.

viso that "this act shall not be construed as granting the lessees any rights in addition to those granted them in their existing leases," especially when considered, as it must be, in connection with the immediately preceding provision, that "no new leases shall be executed [by the state] for either land or water rights upon any portion of the canal property" here in question during the three-year period given the city to determine whether to lease or buy. Aside from the protection expressly given by the act of 1920, plaintiff seeks nothing beyond the water privileges its leases call for.

[2] The Legislature had, in our opinion, the undoubted power to impose upon the city the conditions in favor of the plaintiff as we have construed them. The state owned the canal lands in fee. Malone v. City of Toledo, 34 Ohio St. 541; State v. Snook, 53 Ohio St. 521, 42 N. E. 544. Throughout the Hubbard, Elevator Company, Fox, and Rogers Cases, supra, the power of the state to impose such restrictions, conditions and reservations as its discretion dictated is plainly declared.[10]

[3] The rule is well established that one *for whose benefit* a promise is made may enforce performance in equity.[11] Willard v. Wood, 164 U. S. 502, 519, 17 S. Ct. 176, 41 L. Ed. 531; Johns v. Wilson, 180 U. S. 440, 447-448, 21 S. Ct. 445, 45 L. Ed. 613; Embleton v. McMechen, 110 Ohio St. 18, 30, 143 N. E. 177, 34 A. L. R. 689; Silver King Co. v. Silver King C. M. Co. (C. C. A. 8) 204 F.

---

[10] In the Hubbard Case (page 401) the conclusion that the Legislature did not intend to make the city liable for two classes of damage was said to be "further strengthened by the studied omission of the statute to mention the plaintiff's lease as a subject-matter to be protected, although it could as readily have been done as was the lease of the public works." In the Elevator Company Case (page 641) it was said: "There can be but little room to doubt that the intention of the act was to protect *existing rights*, if any, of lessees of water privileges, and make the city liable to damages to them," etc.; and again: "In making its plan, the city must save all outstanding rights." In the Fox Case (page 502) it was said: "We will assume that it is competent for the state to require that the city should repair and maintain this lock, so as to provide surplus water for the plaintiff." In the Rogers Case (page 143) it was said to be conceded by the parties "that the state in leasing or abandoning the canal might create such restrictions, conditions and reservations as its discretion dictated," citing the Hubbard, Elevator Company, and Fox Cases.

[11] In jurisdictions where the distinction between law and equity is recognized there is a conflict of decisions as to the right to maintain action at law.

166, 169, 122 C. C. A. 402, Ann. Cas. 1918B, 571; Emmitt v. Brophy, 42 Ohio St. 82, 88, et seq. See 6 R. C. L. §§ 271, 274.

[4] From this record it seems the natural, if not the unavoidable, inference that the promise of the state to protect and preserve the rights of owners of water privileges was exacted by the state, and was made by the city (which had knowledge of plaintiff's claim), largely and primarily, even though not exclusively, for plaintiff's benefit. The state was not putting it in the power of the city to terminate plaintiff's use of the canal water because of any need of the water for navigation purposes. Plaintiff owned leases of four-fifths of the water furnished by the 18-mile canal level in question not needed for navigation purposes. So far as shown by the record, plaintiff was the only lessee whose leases expressly gave right to renewal. Plaintiff had, under the supplemental lease and contract of 1910, maintained at its sole expense and was still maintaining the 18-mile canal level in question, and which under that agreement it had at large expense greatly improved, thereby appreciably increasing the state's income therefrom. It had built, and was maintaining, an expensive and valuable plant (presumably in reliance in large part upon the continuation of the water rights) devoted to public utility purposes.

Assuming, without so deciding, that the state could have lawfully terminated plaintiff's water rights and privileges by an abandonment of the canal for navigation purposes, and a sale of the canal lands, it is enough that, as we think, it chose rather to recognize its moral obligation to respect the rights of its lessees, property holders and citizens. That it had the legal and moral right to do so is undeniable. A contrary course would have been unnatural and inequitable. The city, by the acceptance of the deed from the state upon the terms and conditions contained in the legislative act, has effectively contracted to respect plaintiff's interests. This was part of the consideration for the purchase and sale. The city is, in our opinion, equitably estopped from repudiating the obligations towards plaintiff thus deliberately assumed.

[5] The city contends, however, that, as the Law lease expired after the abandonment of the canal and its sale to the city, plaintiff has no legal right to a renewal. This contention overlooks the fact that in the provision for deed to the city, contained in the act of 1920, the "rights of said owners to a renewal of said existing lease (sic)"[12] are ex-

---

[12] Probably intended for "leases."

pressly included in the "rights" *excepted* from the deed and to which it was *subject.*

The renewal portion of the Law lease is in substance that the lessee shall be entitled at the expiration of the lease to a renewal for a like term at the same annual rental, unless some other responsible bidder shall agree to pay more rent and to purchase the lessee's permanent improvements, in which case the lessee may have a renewal at the highest rate so bid. We think State v. Board of Public Works, 42 Ohio St. 607, has no relevancy to the question of construction and validity of this provision. While the leases there involved made by the board of public works, had the same provision, the "sole question involved," decided, or discussed (page 612) related to the validity of another provision, that "on resumption of surplus water and termination of the lease *the board of public works* shall pay to the lessee the value of the lasting improvements erected for the use of such water," which provision was held to be unauthorized and void.

In the instant case the Legislature expressly recognized renewal rights. But, other considerations apart, it would seem enough to say that it is not claimed that there was any other bidder than plaintiff for the renewal. The latter in due season applied to the proper state department for renewal of not only the Law lease (which by its terms would otherwise expire March 12, 1925), but also of the supplemental leases, and of each of plaintiff's other leases, which, unless renewed, would expire at dates ranging from 1931 to 1936, and has paid or tendered all rentals accruing under said leases. The fact, if it be a fact, that, after its deed to the city containing the protective provisions in question, the state took no notice of the request for renewals and declined to receive the rentals tendered, cannot affect the validity and effectiveness of such election to renew and of notice thereof, which thus, unless for the state's act of abandonment and sale, would constitute a renewal and automatically create a new lease. 35 Corp. Jur. p. 1022, §§ 151 and 153; Orr v. Doubleday, 223 N. Y. 334, 119 N. E. 552; Gross v. Clauss, 6 Ohio App. 140; Foster v. Ellison, 31 Ohio Cir. Ct. R. 513.

It follows, from the construction we have put upon the effect of the act of 1920 and the deed thereunder, that, in determining plaintiff's equities as between it and the city, such renewals and rights of renewal must be taken into account.

The decree of the District Court is re-versed and the record remanded, with directions to enter a new decree not inconsistent with this opinion including injunction against doing any act to obstruct or prevent the flow of water in the canal to plaintiff's hydroelectric plant at Maumee, except upon compliance with its obligation to make payment to plaintiff as construed herein.