**MAUMEE VALLEY ELECTRIC CO. v. SCHLESINGER, Superintendent of Public Works, etc., et al.**

District Court, S. D. Ohio, E. D. September 7, 1928.

No. 534.

U. G. Denman, of Toledo, Ohio, and Karl E. Burr, of Columbus, Ohio, for plaintiff.

G. W. Ritter, of Toledo, Ohio, for City of Toledo and Villages of Maumee and Waterville.

L. W. Hunt and H. A. Kineger, both of Toledo, Ohio, for Commissioners of Lucas County, Ohio.

Before DONAHUE, Circuit Judge, and HICKENLOOPER and HOUGH, District Judges, under authority of Judicial Code, § 266 (28 USCA § 380).

HOUGH, District Judge. The plaintiff, a corporation, was organized for, and is in the business of, generating and supplying electricity to the public for light, heat, and power purposes, and in connection with that business is chartered to hold property and acquire and hold leases and contracts for water to be used in the generation of electricity through hydroelectric power plants. It holds by assignment and under its charter power owns certain leases and grants from the state providing for the use of surplus water from the Miami & Erie Canal. Of the seven leases and grants so owned, the Purdy quitclaim grant of December 8, 1845, acquired April 27, 1910, the Studer lease of November 13, 1906, acquired December 11, 1913, the Tyron and the Maumee Paper Company leases, dated April 3, 1903, and acquired, respectively, in 1904 and 1912, are only indirectly involved in this case; the water authorized to be used under their terms being at places and in manner different from the location and method used at plaintiff's plant. The other three leases, that of Robert J. Law, dated March 12, 1895, acquired September 11, 1900, that of George K. Detweiler, dated February 20, 1901, acquired January 25, 1916, and the supplemental lease to the Law lease, dated December 10, 1910, deal with hydraulic power in the vicinity of plaintiff's plant at Maumee, and constitute the real basis of its claims.

These leases were made for terms of 30 years, with provisions for renewal. The Law lease conveyed the surplus water of the canal between Providence and Toledo, not needed for navigation, and not at the time of conveyance under lease. At the time of the assignment of the Law lease, to wit, 1900, the plaintiff company acquired land and constructed a small hydroelectric plant thereon at the location of its present plant. In 1910, when the supplemental lease was made, in order to secure an increase in the flow of water, the plaintiff agreed to remove the rock bars in the canal as well as other obstructions on the 18-mile level between Grand Rapids and lock No. 45, raise the banks of the canal in certain places, and pay the expense of a proper patrol system, and pay an increased rental for the use of water granted under the terms of the Law lease. The plaintiff having also acquired the Tyron lease and the Purdy grant, then reconstructed and rebuilt its hydroelectric plant, greatly increased its capacity, enlarged the water flume, deepened and widened the canal from Grand Rapids to lock No. 45, and made other improvements at a cost and expense of more than $50,000.

The defendant, Schlesinger, as superintendent of public works and director of highways and public works of the state of Ohio, is the real party defendant in interest by virtue of the mandate of the General Assembly of Ohio contained in the Act of May 11, 1927 (112 Ohio Laws, p. 360), the constitutionality of which is raised in this case. The act purports to abandon that portion of the Maumee & Erie Canal in Lucas county, Ohio, for both canal and hydraulic purposes, commencing at a point just below the head of the Maumee sidecut near Maumee, Ohio, thence southwesterly to a point where said canal joins with the Maumee river, being a section of canal 16.5 miles long, and designated for the purposes of this case as lineal part No. 2. The act provides that the title of lands and waters be reserved to the state, and that the same shall be held by the state for the purpose of constructing thereon a highway at such time in the future as it may find proper

and convenient. It also provides that all leases heretofore granted for canal or hydraulic purposes on lineal part No. 2 shall become null and void on and after 60 days from the taking effect of the act. It places lineal part No. 2 under the supervision and control of the state highway director, and commands that official, within 60 days from the taking effect of the act, to drain the water from it and prevent the water of the Maumee river from flowing into or through the abandoned portion. The defendants other than the director of highways are interested and proper parties, although not necessary parties.

The plaintiff's plant, for the operation of which the leased water is used, is located at Maumee, Ohio, between the canal and the Maumee river, adjacent a section of the canal known for the purposes of this case as lineal part No. 1, beginning at the northerly terminus of lineal part No. 2, and being 8.85 miles in length. The situs of the plant is 1.6 miles northerly of the junction of lineal parts Nos. 2 and 1 (the water of the canal flows northerly).

The plaintiff company in its bill seeks injunctive relief against the superintendent of public works and director of the department of highways and public works of the state, enjoining him from carrying out the mandates and commands of the General Assembly as expressed in the act passed by it May 11, 1927, for the reasons, among others, as claimed, that the act is contrary to section 10 of article 1 of the Constitution of the United States, and section 1 of article 14 of the amendments to that Constitution, as impairing the obligation of plaintiff's leases, agreements, and grants, and as depriving plaintiff of its property without due process of law, based upon the contention that the act does not contemplate the payment of a just compensation to plaintiff, and does not take into account plaintiff's vested proper rights.

The case is finally submitted to the court upon the issues joined by the pleadings, affidavits, the written stipulation of facts, with the exhibits attached, and the arguments of counsel.

It is conceded that at the time of the execution of the earliest of the leases (Law lease, 1895) now held by the plaintiff company, navigation had practically disappeared from the canals of Ohio, and that at the time it secured such lease and the other leases and grants, navigation had wholly ceased and has never been resumed. It is further conceded that the leases are entered into under authority of law. And it must be conceded by reason of final judicial decree that the Law lease as modified by the supplemental lease of December 10, 1910, had been renewed for a term of 30 years from March 12, 1925 (Maumee Valley Electric Co. v. Toledo et al. [C. C. A.] 13 F.(2d) 98), and the legal effect of the Purdy grant acquiesced in for a long period of years is established. State ex rel. v. Middletown Hydraulic Co., 114 Ohio St. 437, 151 N. E. 653.

The history of the Ohio canal system begins with the passage of the initial act by the General Assembly in 1820, and from that time until 1849 there were passed numerous acts creating a canal system and providing for the acquirement of the necessary land by gift, grant, and condemnation, and for the construction and operation and regulations for its use. The system was completed in 1845 and was operated for public transportation by the state or its lessees until about the year 1895. In the process of the development of the legislative machinery for the canal system, as early as 1825, and again in 1828, and many times subsequently, the Legislature recognized the propriety of and authorized the sale of surplus water of the canals. The policy and practice of leasing "surplus water" "not necessary for navigation," and the accepting of grants reserving to the grantor "water rights," thus early recognized, extend to all the canals of the Ohio system, and continued to be recognized by the state and the users of surplus water until this controversy arose, and discloses clearly the sovereign encouragement to the development of hydraulic energy, before and after the usefulness of the canals for navigation had ceased because of the development and popularity and general use of other and more rapid means of transportation.

The wisdom of the plan conceived by the early fathers of building a system of water highways over the state "to promote the agricultural, manufacturing and industrial interests of the state" at its formative period, and the operation of the same as a great vehicle of transportation for 50 years, was entirely justified by the unprecedented development and growth of the state and its industries during that time.

The year 1863 marked the beginning of a series of acts of the General Assembly abandoning various sections of the canal "for canal purposes." This legislative surrender of portions of the canal and the authorization of the use thereof for other purposes gave rise to litigation in connection with the intervening rights of individuals holding water rights.

Navigation was, of course, the prime object and original main purpose of the building of the canals. It was a public purpose and exercised by the state in its governmental and sovereign capacity. During the time of the operation and use of the canals for transportation purposes, the use of water for hydraulic power purposes was merely incidental and subordinate to the main purpose. It accordingly became the established law that, when it became inexpedient or inadvisable to continue the canal for navigation purposes, or when some other public purpose, though local in nature, became more important, that part so affected might be abandoned without regard to and notwithstanding the water power leases. Hubbard v. Toledo, 21 Ohio St. 379; Elevator Co. v. Cincinnati, 30 Ohio St. 629; Fox v. Cincinnati, 33 Ohio St. 492; Id., 104 U. S. 783, 785, 26 L. Ed. 928; Vought v. Ry. Co., 58 Ohio St. 123, 50 N. E. 442. Compare, Kaukauna Water Power Co. v. Green Bay, etc., 142 U. S. 254, 282, 12 S. Ct. 173, 35 L. Ed. 1004; Hoagland v. New York C. & St. L. Ry. Co., 111 Ind. 443, 12 N. E. 83, 13 N. E. 572.

The sale of surplus water, subordinate in the first instance and for many years thereafter to the primary purpose and use of the canals, gradually became a contributor to the accomplishment of the main purpose of "promoting the agricultural, manufacturing and industrial interests of the state" in the development of hydraulic power. It becomes obvious that this element of the state's business has become important when we consider that it has gone on without interruption, paralleling the business of navigation until that business outlived its usefulness, and continuing for 30 years thereafter as the chief, if not the sole, use to which the canals have been put, and returning to the state a revenue of $18,000,000, $9,000,000 of which were derived from water rentals of the Miami & Erie canal alone. The revenue itself indicates a business of substantial proportions, to which private capital of necessity was attracted in the building and enlarging of power plants, and to which corresponding property rights and vested interests have become involved.

All the leases herein involved were made pursuant to authority given by act of the General Assembly in 1840. This statute remained unchanged until its amendment in 1917 (107 Ohio Laws, p. 418), and was recognized as meeting all modern requirements by its incorporation in the General Code of Ohio in 1910. Sections 14009 et seq., Ohio General Code; 38 Ohio Laws, p. 87. The

leases were also made subsequent to the time that travel and transportation by canal had become too slow for the then modern conditions. The position of the state had changed from that of operating the canal as a navigable highway to the operation of a great power plant for the sale of power and water to the public. State ex rel. v. Middletown Hydraulic Co., 114 Ohio St. 437, 151 N. E. 653.

■ Viewed in the light of changed and altered circumstances brought about by modern progress and development, facts and situations basically the same may assume a new and different aspect. The relationship between the state and the lessees and grantees of water rights, in defining their respective rights, may call for solution differently, if the altered or changed condition warrants. When engaged in the business of contracting water privileges for the manufacture of power and energy as a principal business, the stated acted in its proprietary capacity. It is a commercial proprietor, bound in its contractual engagements the same as individuals. State ex rel. v. Middletown Hydraulic Co., supra. That a state or subdivision thereof may act in such capacity, and when so doing is amenable to all the rules of law which bound private individuals, is well established in Ohio and elsewhere. South Carolina v. U. S., 199 U. S. 437, 26 S. Ct. 110, 59 L. Ed. 261, 4 Ann. Cas. 737; Vicksburg v. Vicksburg Water Works Co., 206 U. S. 496, 27 S. Ct. 762, 51 L. Ed. 1155; Los Angeles v. Gas & Electric Corporation, 251 U. S. 32, 40 S. Ct. 76, 64 L. Ed. 121; State ex rel. v. Middletown Hydraulic Co., supra; State v. Buttles' Executors, 3 Ohio St. 309; R. R. v. State, 85 Ohio St. 251, 97 N. E. 967, 39 L. R. A. (N. S.) 1219.

■ The leases and grants owned by the plaintiff are subject to a present day construction and interpretation in relation to the surrounding facts and circumstances in harmony with the present relationship of the parties. Ordinarily, such writings are considered contracts. The state, we may now say, in its proprietary capacity has treated them as contracts in accepting rentals, making new leases, contracting with lessees and owners for improvements, permitting the plaintiff to expand its plant by extensive improvements, and permitting the Law lease to be renewed under its own terms. Believing as we do that they assume the dignity of contracts, little difficulty is found in the solution.

The Supreme Court of the United States

in the Dartmouth College Case (Trustees v. Woodward, 17 U. S. [4 Wheat.] !518, 4 L. Ed. 629) held that a charter granted by the British Crown to the trustees was a contract within the meaning of the clause of the Constitution, which declares that no state shall make any law impairing the obligation of contracts, and that the act of the Legislature of New Hampshire altering the charter in a material respect was void under the Constitution.

In the case of Power Co. v. City of Akron, 240 U. S. 462, 36 S. Ct. 402, 60 L. Ed. 743, the court had before it a bill of complaint alleging that a municipality does not intend to institute proceedings to condemn, but does intend to take plaintiff's property rights without compensation, and that in so doing .it purports to be acting under an ordinance which violates the contract clause of the Fourteenth Amendment to the Federal Constitution, held that it was necessary under such allegations to take jurisdiction and determine the merits.

In Russell v. Sebastian, 233 U. S. 197, 34 S. Ct. 517, 58 L. Ed. 912, Ann. Cas. 1914A, 152, the same court, having before it a franchise of a public service corporation and a municipal ordinance of the city of Los Angeles adopted in pursuance to the amendment to the California Constitution, held that the franchise was a contract, and that the ordinance was ineffectual under the contract clause of the Federal Constitution to deprive the corporation, which had accepted the offer of the state contained in the Constitution before the amendment, of its right to continue to lay pipes in the streets of the city.

In the case of Hays v. Port of Seattle, 251 U. S. 233, 40 S. Ct. 125, 64 L. Ed. 243, the rule is announced that a bill setting up obligations of contract with the state and charging that they were impaired by subsequent state legislation presented a controversy under the Constitutions conferring jurisdiction upon the District Court.

And in the case of City of Los Angeles v. Los Angeles Gas & Electric Corporation, 251 U. S. 32, 40 S. Ct. 76, 64 L. Ed. 121, the same principle was again announced, wherein it was said that a franchise to use the streets for supplying the city and its inhabitants with electric light, acquired under the California Constitution before the amendment of 1911, conveys contract rights which the city is not at liberty to destroy, and the property employed in their exercise cannot be taken by the city without due process of law—the payment of compensation. This same case also recognized the principle that

there is a distinction between the powers of a city when acting in its governmental capacity and those which belong to it in its proprietary or quasi private capacity.

Equity will furnish the remedy in this case, as no adequate remedy at law exists. And while the action of the Legislature may be construed as a repudiation of the state's contracts as distinguished from an action, that only impairs its obligation, as treated in the Seattle Case, supra, yet the law of Ohio furnishes no remedy at law under either the "contract clause" or the "due process" clause of the Constitution. Connected with the discussion and conclusion arrived at above, it should be noted that in 1925 the General Assembly of Ohio passed an act (111 Ohio Laws, p. 367), abandoning the same section (Lineal part 2) as was attempted to be abandoned under the Act of May 11, 1927. The former expressed a clear and unambiguous intention on the part of the Legislature to protect the rights of the lessees of water. The statutory expressed intention to so protect, in this act (entirely absent in the latter act) certainly is a recognition by the state of the contractual relationship between it and the lessees of water, and the abandonment, in the latter act, of the same section of canal as was abandoned in the former, raises the query: How effective, if at all, was the reabandonment feature of the latter act?

Moreover, in 1920 an act was passed (108 Ohio Laws, pt. 2, 1138) abandoning lineal part No. 1 of the canal, and providing for the appraisement of the abandoned section, giving the city of Toledo an option of purchasing or leasing the same, but in either event, in clear and unequivocal terms, protecting the rights of existing leases and the rights of the owners thereof to renewal. The city of Toledo decided to exercise the option of purchase, and in accordance therewith, and in accordance with the terms of the act, and in due course received a deed for the abandoned portion subject to the rights of the lessees of water. The city of Toledo failed to carry out the provisions of the act in reference to the adjustment and payment of compensation to the lessees, and upon its taking action for the purpose of "cutting off" the water from the abandoned section, this plaintiff instituted its suit in equity against the city of Toledo, and finally procured a permanent injunction against the city from so cutting off or draining the water from such section. Maumee Valley Electric Co. v. City of Toledo (C. C. A.) 13 F. (2d) 98.

Obviously the carrying out of the man-

323

date by the superintendent of public works and the director of the department of highways and public works, under the provisions of the Act of May 11, 1927 (112 Ohio Laws, p. 360), in draining the water from lineal part No. 2 and preventing the water of the Maumee river from flowing into or through the abandoned portion (the water of the canal flowing northerly and passing from lineal part No. 2 to lineal part No. 1), would effectually nullify the force and effect of the final decree of the Court of Appeals. Maumee Electric Co. v. City of Toledo, supra. This point is raised by appropriate allegations in the bill and in the prayer wherein injunction is asked, "as impairing the obligations of a contract entered into between the State of Ohio and the City of Toledo in behalf of and for the benefit of plaintiff and as depriving plaintiff of its property rights under said contract without due process of law."

The effect of the reabandonment of lineal part No. 2, the legislative nullification of a judicial decree, the good faith, or want of good faith, of the Legislature in legislating away the force and effect of such decree, and the remedy due plaintiff growing out of the contractual relationship between the state and the city of Toledo are questions that may well seriously address themselves to a court of equity; but in view of the position taken by the court and the conclusions drawn upon the other angle of the case, it is unnecessary to pass upon these considerations at this time.

Injunction allowed. See decree.

DONAHUE, Circuit Judge, and HICKENLOOPER, District Judge, concur.