## PETERSON v. TILLINGHAST.

(Circuit Court of Appeals. Sixth Circuit.   December 5, 1911.)

### No. 2,138.

1. BILLS AND NOTES (§ 96*)—DEFENSES—ACCOMMODATION.

It is a defense to a note in the hands of a national bank's receiver that it was given in good faith to the bank solely for its accommodation, and on agreement that the bank would provide for its payment, and never call upon defendant maker to pay it.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. § 165; Dec. Dig. § 96.*]

2. BILLS AND NOTES (§ 503*)—EVIDENCE—ADMISSIBILITY.

Where a maker sued on a note by the payee bank's receiver claimed that the note was given for the bank's accommodation, and the receiver claimed that it was given for the benefit of another corporation in which the maker was interested, it was error to refuse to permit him to show the amount of the company's stock for comparison with his holdings.

[Ed. Note.—For other cases, see Bills and Notes, Dec. Dig. § 503.*]

In Error to the Circuit Court of the United States for the Western District of Michigan.

Action by Philip Tillinghast, receiver, against A. W. Peterson. Judgment for plaintiff, and defendant brings error. Reversed, and new trial awarded.

Aaron A. Ferris (M. M. Riley, on the brief), for plaintiff in error.

C. B. Wilby (Philip Tillinghast, on the brief), for defendant in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and HOLLISTER, District Judge.

PER CURIAM. This action was brought by Tillinghast, as receiver of the First National Bank of Ironwood, Mich., to recover upon two promissory notes made by Peterson. All questions concerning one of the notes were eliminated in the court below, and the present controversy relates only to the other. It is a demand note, dated October 1, 1908, payable to the order of the bank for $2,500, with 6 per cent. interest. At the close of all the evidence offered, a motion to direct a verdict for the full amount of the note with interest was granted; and the amount was subsequently reduced to the extent of a deposit existing in the bank in favor of Peterson. Judgment was thereupon entered for the balance due, $2,693.75, with interest from the date of the verdict.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

To the declaration a plea of the general issue was interposed, with notice of special defense that the note was executed solely for the accommodation of the bank, and upon an express agreement that the bank would provide for its payment and never call upon Peterson to pay the note. Special instructions to the jury were requested in Peterson's behalf and refused; and under the assignments of error several questions of law are presented, which, so far as necessary to pass upon, will be stated as we progress. The main complaint of error concerns the instruction to the jury to return a verdict in favor of the receiver.

Peterson testified that the cashier of the bank asked him if he would sign a note for the bank for $5,000, to which Peterson replied that he did not think his note for that amount would look well in the bank, because he had some paper there already. The cashier then stated "that he did not propose to have it in the bank," indeed, that he did not know whether he would use the note at all, but that, if he did, he would use it "for the purpose of raising money from some outside bank." Peterson told him that he "might sign a note for half that amount to accommodate them, if he thought that that would do them any good;" and, further, that the cashier told him that, if he gave a note, he "should never have to pay, because that would be taken care of by the bank." Peterson testified, also, that he had known the bank since 1890, that he had several deposits there, and that, "the reputation of the bank for solvency and prosperity was first class;" also, that the president and cashier "were considered among our best men and were considered wealthy." It was admitted by the receiver as a fact:

"That this bank was then (at the date of the transaction) of high reputation, and that Mr. Peterson had entire confidence in its solvency and responsibility, and that he had no reason to have any suspicion on that subject."

Peterson was asked on cross-examination whether he had been requested to sign the note "for the Harqua Hala Mining Company so the money could be raised to pay its floating debt," and also whether he had not repeatedly admitted that the note was given in the interest of that company; but he denied that he had been so requested or that he had made any such admission. He did admit, however, that at the date of the note he was interested in the company to the extent of 110 shares of the par value of $10 each, and that he had about the same amount of its bonds. The receiver gave proof on rebuttal by himself and two other witnesses tending to show that Peterson stated to them:

"That he gave the $2,500 note in question at the request of Mr. Larson (the bank's cashier) for the benefit of the Harqua Hala Mining Company * * * for the purpose of having such note discounted by the bank, to raise money for the mining company."

In the course of Peterson's testimony this occurred:

"The Court: And your understanding was that he (Larson) was to send it; if he used it (the note), he was to send it to a bank at Milwaukee, or somewhere else, to be discounted? A. That was his statement that, if he used it at all, he would use it outside of the city, and I think he mentioned Milwaukee, but that I am not sure of. The Court: Did you ever under-

stand that it might be discounted at some bank away, whatever one he selected? A. Yes, sir."

It was stipulated that at the time of the failure the bank's books showed a capital of $50,000 and a surplus of $20,000; that claims had at the time of the trial been allowed for $614,000; and that, including the proceeds of 100 per cent. assessment, the bank will not pay more than 30 per cent. to 35 per cent. of its liabilities; that "the bank was insolvent at all times from and after October 1, 1908"— the date of the note. It appeared by the books of the bank that this $2,500 note was passed into its assets in October, 1908; and it was conceded by Peterson's counsel that a national bank examiner on November 20, 1908, "found among the assets of the bank the $2,500 note in question, and in his examination treated it as part of the assets of the bank."

The learned trial judge reached the conclusion that:

"In the ordinary case of an accommodation note given to a national bank, it is against the theory and policy of the law and against the proper rules of public policy to permit the giver of the note to deny liability upon such note."

And later the court stated that since it—.

"appears by Peterson's statement that this note was given by him as an accommodation to the bank, and, for the purpose of becoming a part of the assets of the bank, I direct you that he cannot now be permitted, against the receiver of the bank, under the circumstances of insolvency here existing, to deny liability; and you will, therefore, render a verdict in this case for the sum," etc.

[1] We think the action of the court below must be tested by the decision in Rankin v. City National Bank, 208 U. S. 541, 28 Sup. Ct. 346, 52 L. Ed. 610, affirming that of the Circuit Court of Appeals of the Eighth Circuit in the same case, though appearing in that court in the name of the predecessor of Rankin as receiver, viz.: Cherry v. City Nat. Bank, 144 Fed. 587, 75 C. C. A. 343. The controversy in that case had its origin in a complaint of a bank examiner of excessive loans made by the Guthrie Bank (Oklahoma Territory). The Guthrie Bank, through its president Billingsley, entered into an arrangement with the City Bank (Kansas City) under which the City Bank accepted a note in its favor for $30,000 signed by Billingsley, and opened on its books a special account for that amount in the name of the Guthrie Bank. The City Bank had been advised of the purpose of this transaction by letter from Billingsley stating (208 U. S. 542, 28 Sup. Ct. 347, 52 L. Ed. 610): "My reason for wanting this is that I have that amount of excessive loans that the department is kicking about. * * * You will not be out any money and loan and deposit will offset each other on your books." The Guthrie Bank had a general deposit with the City Bank, but it was agreed that the Guthrie Bank should not check against the special deposit account; the arrangement was characterized by Mr. Justice Holmes as "a scheme for a separate paper transaction." Billingsley subsequently sent a letter, with his note, to the City Bank stating that he had given the Guthrie Bank his check on the City Bank for the amount of the note, and that the Guthrie Bank would keep the $30,000 with the City

Bank until the note was retired. In short, the scheme was carried into execution in the Guthrie Bank and in a manner in some respects not known to the City Bank. The three objectionable notes were taken out of the Guthrie Bank's assets and possession. The $30,000 note fell due and another loan for a less sum ($25,000) was, like the first note, credited in the special account to the Guthrie Bank under the same arrangement. The Guthrie Bank failed and its receiver notified the City Bank that the note was not a liability of the Guthrie Bank; and that the City Bank would be held; and suit was brought to recover the amount of the apparent special deposit. The City Bank, having no knowledge of the Guthrie Bank's failing condition, on the day of the failure charged the note to the special account and returned the note duly canceled, closing the account.

The contract was treated in the decision as one made between the banks and as governing all that happened later (208 U. S. 545, 547, 28 Sup. Ct. 348, 52 L. Ed. 610); and say the court: "The whole business from beginning to end was and was intended to be a mere juggle with books and paper to deceive the bank examiner." Again (208 U. S. 546, 28 Sup. Ct. 348, 52 L. Ed. 610):

"As between the banks no one got any money, and the only benefit of the loan in fact or contemplation was a swindle upon the bank examiner. If the City Bank should be held it would be held without ever having received a quid pro quo except in the most narrowly technical sense. The consideration would be the delivery of Billingsley's note by the Guthrie Bank."

The City Bank's liability was measured by its exact promise. It agreed to credit the loans against the notes which it held, on the express condition that no checks should be drawn against them, and that the notes at maturity should be charged against the account and so extinguished. Of this it was said (208 U. S. 546, 28 Sup. Ct. 348, 52 L. Ed. 610):

"We perceive no sufficient ground for substituting a fiction for the only promise the City Bank ever really made. If the Guthrie Bank had sued while it was a going concern it could not have recovered, and the receiver stands no better than the bank."

Recovery was disallowed both in the Court of Appeals and the Supreme Court. It is to be observed, however, that Mr. Justice Holmes twice called attention to the fact that counsel in the case (208 U. S. 545-547, 28 Sup. Ct. 348, 52 L. Ed. 610) "agreed that it was not contended that the contract was illegal because it enabled a false showing to be made of the condition of the Guthrie Bank." This disclaimer was regarded as having possibly affected the findings of the trial court, and for that reason that aspect of the case was not considered. This language immediately follows (208 U. S. 547, 28 Sup. Ct. 349, 52 L. Ed. 610):

"It would not help the plaintiff. McMullen v. Hoffman, 174 U. S. 639 [19 Sup. Ct. 839, 43 L. Ed. 1117]."

It cannot escape attention that the agreement of counsel not to contend that the contract between the banks was illegal could not have been because the contract did not provide for a special deposit ac-

count, and so enable "a false showing to be made of the condition of the Guthrie Bank." Further, it is indisputably true that the City Bank was in the very first letter it received advised of the exact object intended to be accomplished through the special account. It was also advised by letter that Billingsley had given the Guthrie Bank his check on the City Bank for the amount of the loan. Plainly, the City Bank knew that the special deposit was to be employed to retire the objectionable notes in the Guthrie Bank. The fact then that the learned justices concurring in the decision of the court did not consider "that aspect of the case" cannot aid the receiver here any more than it was allowed to help the receiver there; for the alternative reached there was that, if the contract was illegal the law leaves the parties as it finds them, because (208 U. S. 547, 28 Sup. Ct. 346, 52 L. Ed. 610) McMullen v. Hoffman was made the basis of the alternative. 174 U. S. 639, 670, 19 Sup. Ct. 839, 43 L. Ed. 1117.

So far then as Peterson's liability to the Ironwood Bank upon the theory that the note in question was a mere accommodation is concerned, we are unable upon the present record to perceive why this case is not ruled by the decision in Rankin v. City National Bank. True, it does not appear in either of the reports of the Rankin Case whether the insolvency of the Guthrie Bank involved loss to the depositors or not; but if it did not, and that fact was regarded as important, it is to be presumed that it would have been noticed.

In view of the City Bank's connection with the scheme resorted to in that case, as before pointed out, to deceive the bank examiner respecting the assets of the Guthrie Bank, the relevancy of the decision to the main contentions made here is apparent. It is contended that, when Peterson gave the accommodation note (making it payable to the order of the Ironwood Bank) for the purpose of being discounted in some other bank, he was chargeable with knowledge that false entries would have to be made in the books of the Ironwood Bank. It is also contended, and it was so held below, that there must be imputed to him knowledge that the proceeds of the discounted note were to be used to swell the assets of the bank; and consequently that the theory and policy of the law forbid him to deny liability. The inevitable logic of charging Peterson with the consequences of false entries and increasing the bank's assets, as the basis of precluding him from denying liability, is to brand the transaction with illegality.

Now, whatever effect might rightly have been accorded to the agreement of counsel in the Rankin Case not to contend that the contract between the banks was illegal, it is to be borne in mind that it was admitted by the receiver as a fact in the present case that at the date of giving the note the Ironwood Bank was "of high reputation, and that Mr. Peterson had entire confidence in its solvency and responsibility, *and that he had no reason to have any suspicion on that subject.*" Can the receiver consistently both admit that there was no reason for suspicion, and insist that Peterson was bound to suspect—and so to forecast the consequences that might follow his act? There was certainly as much reason for applying a similar rule to

the City Bank in the Rankin Case as there is for applying it to Peterson in this case, if indeed there was not more reason for doing so.

Furthermore, it is to be noticed that the bank did not in fact cause the note to be discounted, and that, instead of doing so, it pursued a course not originally contemplated by the parties, and never by Peterson. Despite this fact, it is insisted in effect that the original purpose to have the note discounted, and also the consequences of that sort of a transaction, forbid Peterson to deny that the note itself was intended to be given and held for the purpose of making it, as such, an asset of the bank. It is unnecessary to pursue the inquiry upon this subject further.

The infirmity of the opinion below was in treating Peterson's knowledge of the proposed discount of the note as conclusive evidence of an intent that the note should be used for an illegal purpose. If it can be said under the decision in the Rankin Case that the knowledge so imputed to Peterson would render him liable on the note, we think the question of the existence of such knowledge was one of fact for submission to the jury under appropriate instructions. The rules of estoppel urged are inapplicable, because (1) the case was disposed of upon a theory alone of law forbidding Peterson to deny liability; and (2), if the case had been submitted to the jury upon questions of fact, the evidence as adduced would have been lacking in some of the essential ingredients of estoppel. Henshaw v. Bissell, 18 Wall. 255, 271, 21 L. Ed. 835; Brant v. Virginia Coal & Iron Co., 93 U. S. 326, 335, 336, 23 L. Ed. 927. As to misrepresentations made to the bank examiner and also to the Comptroller and depositors through false entries in the bank's books and newspaper publications alluded to in the opinion below, the Rankin Case is in point. See, also, (although a case for deceit) Hindman v. First Nat. Bank, 112 Fed. 931, 50 C. C. A. 623, 57 L. R. A. 108 (C. C. A. 6th Cir.).

[2] There is another view of the evidence that requires some consideration. We refer to the issue presented, and upon which testimony was received as to whether Peterson had given the note for the benefit of the Harqua Hala Mining Company, in which he confessedly was interested. In addition to the testimony he was permitted to give in that respect, Peterson sought to show the amount of the company's capital stock for purposes of comparison with his holding. His right to do so was denied and exception reserved. In view of the fact that his denials were met by testimony as to admissions, we think it was competent for him to show the total amount of the capital stock. Since it might be found that the note was in fact given for the benefit of the company, it is possible that the question upon which the case was decided below will become unimportant. The ground upon which the motion to direct was granted rendered consideration of this other phase of liability unnecessary below.

The judgment must be reversed, and a new trial awarded, with costs.