**FIRST NAT. BANK OF ARDMORE v. FIDELITY NAT. BANK OF OKLAHOMA CITY**

No. 16933. Opinion Filed Oct. 25, 1927.

Rehearing Denied April 10, 1928.

(Syllabus.)

1. **Banks and Banking—Restricted Deposit —Proceeds of Loan to Bank Held by Lending Bank as "Dead Balance" Till Note Paid.**

Where the president of plaintiff bank and another give their note to defendant bank, and pursuant to an agreement between the presidents of said banks the proceeds of said note are deposited in defendant bank to the credit of plaintiff as a "dead balance" so long as defendant carries said note, said deposit is a restricted one, and may be applied in payment of said note upon default.

2. **Same—Proceeds of Loan as Collateral Security—Authority for Transaction Established by Bank Usages.**

Authority of the president of a national bank to contract with another bank that a deposit with the latter to the credit of the former shall stand as collateral for the payment of a note, said deposit being the proceeds of said note, may be established by the usage and practice which the directors have permitted to be established in the conduct of the business of the bank.

3. **Same — Rights of Lending Bank as Pledgee of Proceeds not Affected by Officer of Borrowing Bank Transferring Credit to Third Party.**

Where the president of plaintiff bank and another borrow money for plaintiff with the understanding and agreement that the proceeds from such loan should remain in the lending bank as collateral for the debt, and the president of plaintiff bank causes said credit to be entered upon the books of his bank as a general credit and transferred to the account of third parties without the knowledge or consent of the lending bank, such fact does not defeat the right of the lending bank to treat such deposit as a pledge to secure the payment of the loan.

4. **Same — Action by Borrowing Bank Against Lending Bank to Recover Restricted Deposit—Failure of Evidence.**

Record examined, and held, that a demurrer to plaintiff's evidence was rightly sustained.

5. **Appeal and Error—Harmless Errors.**

Errors or irregularities which do not affect the substantial rights of the party complaining will be disregarded on appeal.

Commissioners' Opinion, Division No. 2.

Error from District Court, Oklahoma County; Geo. W. Clark, Judge.

Action by the First National Bank of Ardmore against the Fidelity National Bank of Oklahoma City for the recovery of a deposit. A demurrer was sustained to plaintiff's evidence, and plaintiff appeals. Affirmed.

Potterf & Gray and Embry, Johnson & Tolbert, for plaintiff in error.

Stuart, Sharp & Cruce and John F. Sharp, for defendant in error.

JEFFREY, C. The First National Bank

of Ardmore, as plaintiff, commenced this suit in the district court of Oklahoma county, against the Fidelity National Bank of Oklahoma City, as defendant, for an alleged deposit in the sum of $22,532.94. The petition alleges liability on two theories: That of moneys had and received, and conversion. At the trial of the case to a jury, a demurrer was sustained to plaintiff's evidence, and judgment rendered in favor of defendant for its costs, from which judgment plaintiff has appealed.

The material portions of plaintiff's evidence follows: On the 21st day of October, 1921, one J. S. Mullen, who owed plaintiff large sums of money, called one W. M. Bonner, at Oklahoma City, and requested that he see F. P. Finerty, president of the defendant bank, and ascertain whether or not Finerty, as such bank officer, would loan $22,500 on the note of himself and D. Lacy, the last-named party being president of plaintiff bank. Bonner did call on Mr. Finerty, and Finerty replied that he would take care of Lacy, with the understanding that the proceeds of the loan should remain in the bank until the note was paid. This information was transmitted to Mullen by Bonner, and on October 22, 1921, defendant received a note for $22,500, signed by D. Lacy and indorsed by J. S. Mullen. The net proceeds of the note, being $22,045.50, after deducting the interest for the period of the note together with revenue, were deposited to the credit of plaintiff bank. On that date Finerty, as president of defendant bank, wrote a letter to Lacy, as president of the plaintiff bank, which is as follows:

"F. P. Finerty, President.   Jno. A. Campbell,
                                      "Cash.

"Royal C. Stuart, V. Pres.   J. M. Bellenger,
                                      Asst. Cashier.

"C. M. Bosworth, V. Pres.

"M. M. Bath, Asst. Cash.
"Fidelity National Bank.
"Oklahoma City, Oct. 22, 1921.

"Don Lacy, President,
   "First National Bank,
      "Ardmore, Okla.

"Dear Don:

"We credit the account of the First National Bank of Ardmore to-day $22,045.50. being the proceeds of note of yourself for $22,500, less discount and revenue, for 90 days.

"My understanding from Mr. Bonner is that this is to be a dead balance as long as we carry this note, and on this we will allow you three per cent. on daily balances.

"I inclose herewith signature card which kindly execute and file with us, and I will be mighty glad if your remittance department gets balled up some day and begins giving us some of your Oklahoma City account. Please remember that we are a national bank now, and are ready, willing and able to serve you, and we would surely appreciate a part or all of your active account.

"With kindest regards, and hoping this little transaction is only a starter to a large business relation, I am,
               "Very truly yours,
          "F. P. Finerty, President."

This letter was received by Lacy, and on October 25th Lacy replied with the following letter:

               "First National Bank.
                  "Capital,   $200,000
                  "Surplus $100,000
          "Ardmore, Okla., October 25, 1921.

"Mr. F. P. Finerty, President,
   "Fidelity National Bank,
      "Oklahoma City, Oklahoma.

"Dear Mr. Finerty:

"We acknowledge receipt of yours of the 22nd, advising the credit for account of J. S. Mullen. You understand Mr. Bonner correctly. We do not intend to check against the balance as long as you are carrying the loan, and when money matters ease up, hope to do some active account business with you.

"Enclosed find signature card bearing the signature of our officers authorized to sign for the bank.

"Thanking you very much for the favor. and with kindest regards,
               "Yours very truly,
"D L-G.         D. Lacy, President."

The evidence further discloses that at the time of this transaction plaintiff was in great need of money with which to pay its drafts and checks; that on the 22nd day of October, the date plaintiff was credited with the deposit in the defendant bank, plaintiff received a cash letter from the Federal Reserve Bank of Oklahoma City for the sum of $48, 433.71, and that one of the items included in the cash letter was a draft of the Farmers & Merchants Bank at Ranger, for $24,938.25. The evidence further discloses that, at the time this draft was received, there was not sufficient money in the account of the Ranger bank with which to pay said draft, and that Mullen's account showed an overdraft of $25. At that time Lacy, as president of the plaintiff bank, directed one of the tellers not to pay the item, but stated that he was expecting a

credit sufficient to pay the draft before time to return it. During the day Lacy furnished the teller with charge slips directing him to charge defendant with $21,900, to credit the account of J. S. Mullen with a like amount, and in turn transfer $22,671,65 from Mullen's account to the account of the Ranger bank, which, with the balance then in the Ranger account, equaled the amount of the Ranger draft. The cash letter was then paid by three drafts. one drawn on Federal Reserve Bank in Kansas City, for $15,000, one on Central National Bank at Tulsa for $5,000, and one on the First National Bank of Oklahoma City for $28,433.71. After Lacy received the letter from defendant showing the amount of credit given plaintiff, a similar transaction was had with reference to the additional $145, which had not been entered on plaintiff's books.

The note at the defendant bank was renewed from time to time, and the renewal notes were executed in the same manner as the first note, except that the first renewal note was signed by J. S. Mullen as maker, and indorsed by D. Lacy. Mullen paid the interest as it became due, amounting in all to $1,800, and defendant allowed plaintiff the three per cent. on daily balances as stated in Finerty's letter.

On April 4, 1922, Ed Sandlin, as cashier of plaintiff bank, wrote the defendant bank saying that the books of plaintiff bank showed that it had been carrying for sometime a balance for something more than $20,000 in defendant bank, and inquired as to whether this deposit was being held as security for any indebtedness. On April 7, 1922, F. P. Finerty, as president of defendant bank, replied by letter that the balance to the credit of plaintiff was left there distinctly as collateral to the note of Don Lacy and J. S. Mullen, and was to be left there until the note was paid. Several months later other letters passed between plaintiff and defendant, in which plaintiff denied that the deposit to its credit in defendant bank was a restricted deposit and not subject to check, while defendant insisted that the deposit was originally made as a restricted deposit, as security for the note of Don Lacy and J. S. Mullen, and not subject to check until the note was paid. On August 21st, plaintiff drew its draft on defendant bank for the sum of $22, 532.94, which draft was protested by defendant, and on September 8, 1922, defendant charged the Lacy note to said account and mailed the note together with a cashier's check for the sum of $133, representing the interest accrued on said deposit over and above the amount necessary to pay said note. Plaintiff returned the note and cashier's check, and insisted that defendant had no right to use the funds to the credit of plaintiff in payment of said note.

On or about August 21, 1922, plaintiff bank was reorganized, and Don Lacy was let out of the bank as its president. Neither he nor Mullen testified at the trial of the case, and the record discloses that at the time of the trial F. P. Finerty was dead. It further appears that the defendant bank did not carry the account on its books as a special account; but that sometime during the summer of 1922, at the request of a bank examiner, placed said amount in a cashier's check and attached the same to the Lacy note. There was other evidence, such as reconcilement statements, reports of the national bank examiner, reports and letters from defendant bank to the bank examiner, and books, accounts and documents showing certain transactions between the Farmers & Merchants Bank at Ranger and plaintiff bank, especially with reference to a collection made by plaintiff bank for the Ranger bank in the sum of $24,766.66, known as the Morris Sass note. It will not be necessary to set out in detail this evidence for the reason that much of it can serve no beneficial purpose in a correct determination of the questions before us.

The principal question presented to this court is that the trial court erred in sustaining defendant's demurrer to plaintiff's evidence, and in rendering judgment in favor of defendant. This question presents several legal questions, all of which have been ably briefed by counsel for the respective parties. A demurrer to the evidence admits every fact which the evidence in the slightest degree tends to prove, and all inferences or conclusions that may be reasonably and logically drawn from the evidence. In this discussion certain evidence, offered by defendant as a part of its cross-examination over the objection of plaintiff, consisting of reports of bank examiner, letters of defendant bank to the bank examiner and a deposit slip, will be disregarded. This evidence may have been properly received for some purpose if limited in its effect by adequate instructions to the jury. But there is nothing in the record to show for what purpose these things were admitted in evidence, nor to what extent, if any, they were considered by the court. We think it proper to eliminate them entirely for the purpose of determining whether or not the demurrer should have been sustained. Viewing the evidence in this light, is plaintiff entitled

to a judgment on the showing made? Plaintiff contended that the proceeds of the note when placed to the credit of plaintiff were never impressed with any restrictions, and were at all times the property of plaintiff and subject to its check. It is also contended that the loan was made by defendant to Lacy and Mullen, and that plaintiff bank was merely used as a banking instrumentality for the purpose of paying out the amount of the loan to Lacy and Mullen.

It is further urged that Lacy, although president of plaintiff bank, was acting in his own interest and opposed to the interest of his bank, and that being the case he did not represent his bank and could not bind his bank in such transaction.

Under the record, as it comes to us, only three questions need be decided in determining whether the demurrer was rightly sustained. Could it be said as a matter of law that the deposit was made and credit given with the understanding that it was a pledge or security for the payment of the Lacy note and not subject to check? Did Lacy have authority to make the transaction for his bank? and if Lacy was acting in the interest of himself and Mullen, or either, as opposed to the interest of his bank, was this known or should it have been known to Finerty, or the defendant bank?

The defendant's rights and liabilities, if any, should be measured by its original agreement evidenced by the conversation between Finerty and Bonner, the note, the deposit, Finerty's letter to Lacy of date October 22nd, and Lacy's reply under date of October 25th. It was so held in Peterson v. Tillinghast, 192 Fed. 287. It will be recalled that the transaction, in so far as defendant was concerned, had its beginning when Bonner asked Finerty at the request of Mullen if he would loan $22,500 on Mullen's and Lacy's note. The evidence discloses that Finerty knew Lacy, and knew that he was president of plaintiff bank, but does not disclose whether he knew Mullen or not. Finerty advised Bonner in substance that he would loan Lacy this amount of money, provided the proceeds of the note were left in the bank, and not checked against as long as defendant carried said note. This conversation occurred October 21st, and on the following day Finerty received the note in question, and while it is not conclusively shown in what manner the note was received, it appears that it must have arrived by mail. On that date Finerty caused the note to be discounted and the net proceeds thereof placed to the credit

of plaintiff bank, and advised Lacy, as president of that bank, of this fact. As far as the record discloses, the two letters above set out and referred to are the only communications that passed directly between Finerty and Lacy pertaining to this transaction. Finerty's letter advised that on that date defendant credited the account of plaintiff with the sum of $22,045.50, the same being the proceeds of the Lacy note less discount. There is nothing ambiguous about that statement. The next idea conveyed by the letter is that Finerty understood from Bonner that the credit was to be a dead balance as long as defendant carried the note. What does the expression "dead balance" mean in this connection? We think its meaning is too clear to admit of either proof or argument. Upon a casual reading of the letter there could be no doubt in the mind of an ordinary business man, much less an experienced banker, that Finerty was conveying the idea that he had been assured that the proceeds of the note would remain in his bank as security for the payment of the note. No other meaning or definition of the term, as used in this connection, would accord to Finerty the intelligence and business discernment to which the least experienced bank clerk is entitled. We are aware that testimony was given to the effect that a dead balance was sometimes used to designate an inactive account, which was not ordinarily checked against, but which may be checked against at any time. It should be sufficient to say that Finerty's letter shows clearly that he was interested in security for the note, and if the account were to be treated as one that may be checked on any time, it would be no security at all.

Finerty's letter was addressed to the chief executive officer of plaintiff bank, and, under the record, we have no doubt but that Lacy was the proper officer for Finerty to communicate with relative to the credit. This was the first information which came to plaintiff bank that credit had been extended it in the defendant bank. Finerty only expressed himself on two occasions, one was to Bonner that he would make the loan, and the other was to Lacy that he had made it, and at both times conveyed the idea that the money loaned would have to remain in the bank as security for the payment of the loan so long as his bank carried said note.

When Lacy received Finerty's letter, he replied immediately that Finerty understood Bonner correctly; and that they did not intend to check on the account as long as

defendant carried the note. This letter confirmed Finerty's understanding, and doubtless, had it not, the credit would have then been withdrawn. It is true that Lacy, in his reply of October 25th, referred to the credit for account of J. S. Mullen. However, Finerty did not say anything about J. S. Mullen or his account in his letter to Lacy; but stated that credit had been given plaintiff under the conditions therein named. Lacy replied saying that Finerty had a correct understanding as to how the account should be carried. It should be remembered that prior to receipt of Finerty's letter, Lacy had caused a general credit to be entered on the books of his bank and a charge against defendant bank for the sum of $21,900, and yet he had received no information that any credit, whatever, had in fact been given his bank. The evidence also shows that prior to the receipt of Finerty's letter the amount credited to the account of plaintiff had been transferred to the account of Mullen and later to the Ranger bank account. We think there is no room for doubt that the credit was given with the understanding on both sides that it was to remain in defendant bank as security for the **note** as long as defendant carried the note, and that the trial court was justified in finding so, as a matter of law.

Counsel for plaintiff have presented numerous authorities to the effect that a national bank, through its officers and agents, cannot become an indorser on notes of third parties or lend its credit to third parties. Another proposition, which has been exhaustively argued and briefed by counsel for plaintiff, is that an executive officer of a bank cannot make a binding obligation for his bank, which is to the benefit of the officer and to the injury of the bank, where the one with whom the bank officer is dealing has knowledge of the bank officer's private interest. Both of these appear to be sound principles of law, and are well supported by the authorities. Some of the authorities extend the rule still further, to the effect that where the proposed transaction is unusual in the banking business and not ordinarily within the power and authority of such bank officer, it then becomes the duty of the person with whom he seeks to deal to ascertain whether such bank officer has authority from his board of directors to engage in such transaction and to bind his bank. None of these principles of law help plaintiff's case. The transaction, in so far as defendant was concerned, did not tend to lend the bank's credit, or undertake to bind it as an indorser or grantor for **any**-

one else. The credit was given plaintiff with certain restrictions, and defendant was justified in believing that plaintiff would not be injured in the transaction. At any rate, defendant cannot be charged with any fraudulent or wrongful shifting of accounts in plaintiff bank, which was done without defendant's knowledge or consent. The apparent effect of the transaction was to swell the assets of plaintiff on its books, while in fact such was not the case. That could not affect defendant's rights to its security. There was nothing wrong with the transaction with which defendant had to do. Hanover National Bank v. First National Bank, 109 Fed. 421, 48 C. C. A. 482. If Lacy had complied with what the evidence shows to have been the understanding between the parties, plaintiff bank would not have paid any money to Mullen, if, in fact, it did, or to anyone else. It is admitted by counsel for plaintiff, and well established by recent authorities, that an executive officer of a bank may borrow money for his bank in the usual course of banking business and thus bind his bank.

The evidence shows that for a long time Lacy had almost complete management of the bank, and everyone connected with the bank had implicit confidence in him. Unquestionably, through the long course of dealings disclosed by the evidence, Lacy had authority to borrow the money, and pledge the same as security for the debt. There was nothing unusual in this transaction. Bell v. Hanover National Bank, 57 Fed. 821; Martin et al. v. Webb et al., 110 U. S. 7; Mahoney Mining Co. v. Anglo-Californian Bank, 104 U. S. 192, 26 L. Ed. 707; Auten, Receiver, v. U. S. National Bank, 174 U. S. 125, 43 L. Ed. 920.

In the case of Rankin, Receiver of the Capital National Bank of Guthrie, Oklahoma, v. City National Bank of Kansas, City 208 U. S. 541, a very similar situation existed. The bank examiner had complained to Billingsley, president of the Guthrie bank, about three notes held in said bank in the amount of $10,000 each, for the reason that they were excessive loans, Billingsley wrote the president of the Kansas City bank that such complaint had been made on the paper in his bank, and asked for a loan for his bank of $30,000, with the understanding that he would execute the note, and that the Kansas City bank would give the Guthrie bank credit for the amount of the note, but that said money would not be withdrawn from the Kansas City bank while said note was held. Later a renewal note was given in the sum of $25,000, under the same arrange-

ment, except that it was understood that the note could be charged against the deposit at any time. Billingsley made certain transfers and entries upon the books of his bank, with reference to this account. The Guthrie bank failed, and the receiver commenced suit against the Kansas City bank for a recovery of the deposit. The case was first reported under the style "Cherry v. City National Bank of Kansas City, 144 Fed. 587," in which the Circuit Court of Appeals affirmed the judgment of the trial court denying recovery. Plaintiff appealed to the Supreme Court of the United States as successor of Cherry, and, while the facts are in some particulars different from this case, the reasoning employed therein is particularly applicable, and, we feel, controlling in the determination of the questions before us. The material portion of that opinion is as follows:

"This suit it will be remembered is to recover an alleged deposit, and the first thing to notice is that the whole business, from beginning to end, was and was intended to be a mere juggle with books and paper to deceive the bank examiner. The City Bank never received anything from the Guthrie bank, the Guthrie bank never parted with anything to the City Bank, or with any thing for the loss of which the City Bank is responsible, if it parted with anything at all. It would stretch the findings to say that the Guthrie bank does not still own the three notes. But if it does not, the City Bank had nothing to do with its giving them up. The supposed surrender was not a consideration to the City Bank, and so far as appears never was known by it to have taken place. It was a transaction wholly between Billingsley and his own bank. So far as the surrender of the notes goes, the parties stand exactly as if that had taken place without a check in consideration of Billingsley making the note on which the credit was given to the Guthrie bank. It is said that the Guthrie bank got the money, but did not get the benefit of the loan. As between the banks no one got any money, and the only benefit of the loan in fact, or contemplation was a swindle upon the bank examiner. If the City Bank should be held, it would be held without ever having perceived a quid pro quo except in the most narrowly technical sense. The consideration would be the delivery of Billingsley's note by the Guthrie bank.

"Again, the alleged deposit was a parol contract made by the letters of which we have given extracts. There is no other contract but the one so made. But by those letters the City Bank did not promise to hold $30,000, or at the later stage $25,000, to the credit of the Guthrie bank out and out. On the contrary, it merely agreed to credit these sums against the notes which it held, on the express condition that no checks should be drawn against them, and that when the first note matured, or, after the second, whenever the bank pleased, the notes should be charged against the account and extinguish it. We perceive no sufficient ground for substituting a fiction for the only promise the City Bank ever really made. If the Guthrie bank had sued while it was a going concern it could not have recovered, and the receiver stands no better than the bank.

"This promise, however, the City Bank made to the Guthrie bank at the first step of the transaction, and not to Billingsley. The plan was proposed as a plan for the help of the Guthrie bank. It provided from the start for a credit to the Guthrie bank. At the moment when the agreement was reached and Billingsley sent his note he signed a promise as president, embodying the terms. He corrected the letter with his second note to an official promise in like form. This meant a promise by the Guthrie bank, and shows that the Guthrie bank, not Billingsley, was the other party to the bargain. It is true that Billingsley's personal obligation was given to the City Bank, but the only reasonable interpretation is that he lent his credit to the bank of which he was the leading spirit, to help it to perpetuate its fraud. It seems to us too plain for further argument that the contract concerning the credit was made between the banks at the beginning and governs all that happened later.

"The only material thing that happened was Billingsley's drawing his check on the City Bank for the amount of the loan and depositing it to his credit in his own Guthrie bank. Even if this, as in other cases, was regarded as a deposit of the bank's money, still it was not quite logically consistent with his contract that Billingsley should make his check upon the City Bank for money which it had agreed with the Guthrie bank to credit to it. But the check was only a documentary form to justify the the entry of a deposit. To the City Bank it was immaterial, as the result no less was the credit to the Guthrie bank upon the special account and subject to the terms to which both parties had agreed. The subsequent check on the Guthrie bank to the Guthrie bank was another documentary form to give a plausible justification for getting the three notes out of the assets. But with that, as we have said, the City Bank had nothing to do.

"In view of the statement of counsel, at the argument, to the circuit judge, that they did not contend that the contract was illegal, a disclaimer repeated to us, and in view of the possibility that the facts were found as they were with that agreement in view, we shall not consider that aspect of the case. It would not help the plaintiff. Mc-

Mullen v. Hoffman, 174 U. S. 639. We are of the opinion upon the facts that we have set forth that the courts below were right."

See, also, Peterson v. Tillinghast, 192 Fed. 287; Fisher v. Tradesman National Bank, 64 Fed. 706; Fisher v. Continental National Bank, 64 Fed. 707; Bell v. Hanover National Bank, 57 Fed. 821; Martin et al. v. Webb et al., 110 U. S. 7; Citizens' National Bank of Headrick v. Citizens' National Bank of Altus et al., 75 Okla. 225, 182 Pac. 657.

A very similar situation arose in the case of Citizens' Bank of Headrick v. Citizens' State Bank of Altus et al., 75 Okla. 225, 182 Pac. 657. There Ernst, as president of plaintiff bank, borrowed $2,000 from another bank for the credit of his bank, and gave his individual note therefor. It was agreed that said credit might remain in the lending bank as a part of its legal reserve not subject to check. Plaintiff brought suit for the deposit and insisted that defendant bank should not be permitted to contend that said deposit was a restricted one, since it carried said deposit on its books for a long time as a deposit due and owing plaintiff without any restriction. This court answered that contention in the following language:

"We agree with counsel that the way the account originated was not in accord with good banking, and doubtless had the effect of deceiving the Bank Commissioner, as it was reported to the banking departments as an asset of the plaintiff bank; but when it is conceded, for the sake of argument, that these banks were not authorized to create a fictitious account, it does not help plaintiff's case. The account was created at the instance of its own officer, and it will not be permitted to receive the benefit of his act and at the same time be relieved of its burdens. Plaintiff had not actually deposited any money in the defendant bank, and it cannot take advantage of its wrong, and certainly cannot be held to be a depositor in good faith, notwithstanding the fact that the defendant banks were parties to such wrongful conduct."

Hay Billingsley in the Rankin Case and Ernst in the Headrick Case, after receiving the credit in the other banks, juggled their accounts in such a way as to transfer such credits to third parties, the conclusions reached in those cases would necessarily have been the same. The loss would then, as in this case, rest between the bank which had been swindled, and its unfaithful officers. Greater precaution against loss to plaintiff could hardly be asked than that exercised by Finerty, when he required that the money remain in his bank.

Plaintiff's entire argument seems to rest on a false premise. It assumes that the loan was, in fact, secured for Lacy and Mullen personally, which fact the evidence does not show. Indeed, taking the evidence as it is, it shows that the loan was for the bank. The disposition made with the credit by plaintiff after it was received has nothing to do with defendant's liability unless it should be shown that defendant through its officers and agents knew at the time of the transaction, or had reason to believe that the credit was to be used in some such manner. Anything to the contrary would be an anomaly unknown to the law.

It is argued by counsel for defendant, that plaintiff received and accepted a benefit from the transaction, and should not be heard to repudiate the accompanying obligations. It seems that plaintiff did receive and accept a benefit. But if it may be said that no benefit accrued to plaintiff by reason of said credit, the result would be the same. Plaintiff did not put anything in defendant bank, and so long as defendant had no part in the transaction by which plaintiff was swindled, plaintiff should not be permitted to take from defendant that which rightfully belonged to it as security for the note.

We think the trial court was justified in finding as a matter of law that Lacy had authority to secure the loan for his bank; that the credit was given plaintiff and not Lacy and Mullen; that it was understood by all concerned at the time that the proceeds of the note were to remain in defendant bank as security for the payment of the Lacy note; and that the evidence failed to establish that Finerty knew or had reason to believe that the credit extended plaintiff was in fact for Lacy and Mullen or either of them individually.

It is next contended by plaintiff that the court committed error in receiving in evidence the letters between Finerty and Lacy and various other instruments in writing, including a deposit slip which was retained in the files of the defendant bank with a notation that said deposit was not subject to check, comments in the reports of the national bank examiner and letters of Finerty and defendant bank to the national bank examiner. Objection was made to the admission of the Finerty and Lacy letters on the ground that Lacy was not dealing or corresponding for plaintiff bank, but for his private interest and that of J. S. Mullen. We, having reached the conclusion that Lacy was acting within the scope of his authority, as president of plaintiff bank; that the credit

was given to the bank with restrictions; and there being no evidence to show that the defendant bank through its officers and agents had any knowledge that said transaction was for the personal benefit of Lacy or any third person as opposed to the interest of the bank; and there being no facts or circumstances connected with said transaction which should have put defendant on notice that said credit was for the use of any other than plaintiff, further discussion of the admission of these letters becomes immaterial. With reference to the other evidence admitted over objection of plaintiff on cross-examination, it has been eliminated entirely for the purpose of this opinion.

It is next contended that the court erred in sustaining defendant's motion to strike out certain of the allegations of plaintiff's reply. We have examined the pleadings and that portion of the reply which was stricken by the court, and are of the opinion that the action of the court was not prejudicial to the substantial rights of plaintiff. Counsel for plaintiff only argue their objection to the court's striking from their reply an allegation that Lacy's contract with defendant was in contravention of the national banking laws. Under the views heretofore expressed, that question becomes immaterial.

We find no reversible error in the record, and the judgment of the trial court is therefore affirmed.

BENNETT, TEEHEE, REID, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.