### LAURENT v. ANDERSON.
No. 6384.

Circuit Court of Appeals, Sixth Circuit.
May 7, 1934.

D. R. Castleman, of Louisville, Ky. (Selligman, Selligman & Goldsmith, of Louisville, Ky., on the brief), for appellant.

Robert S. Marx, of Cincinnati, Ohio (Nichols, Morrill, Wood, Marx & Ginter, of Cincinnati, Ohio, on the brief), for appellee.

Before HICKS and SIMONS, Circuit Judges, and HAHN, District Judge.

HAHN, District Judge.

The action in the court below was one at law by the receiver of the National Bank of Kentucky, an insolvent national bank, to recover statutory double liability duly assessed against the receiver of the Banco Kentucky Company, a Delaware corporation. A jury

was waived, and the case was tried to the court. Recovery was had for the full amount of the assessment. For convenience, the parties will be referred to in this opinion as Banco and as receiver.

The assessment of double liability was made against Banco upon the theory that, being the holder of trustees' participation certificates issued under a trust agreement dated April 22, 1927, it was the real and beneficial owner of national bank stock. The purpose of that agreement was to merge and unify the control and management of the National Bank of Kentucky and the Louisville Trust Company, a state institution. See National Bank of Kentucky v. Louisville Trust Co. (C. C. A. 6) 67 F.(2d) 97, certiorari denied February 5, 1934, 54 S. Ct. 440, 78 L. Ed. ——. Both of these institutions were located at, and did business in, Louisville, Ky.

To effectuate the merger of interests between these two institutions, it was provided by the agreement that the stockholders of each institution should deposit their stock with six trustees named in the trust agreement, and pursuant to the agreement the trustees issued transferable trustees' participation certificates. As ultimately issued, each certificate represented 69.79 per cent. of National Bank stock and 30.21 per cent. of Trust Company stock. At the time of the appointment of the receiver for said National Bank, Banco owned 540,484 shares, or 95 per cent. of the trustees' participation certificates which were issued under the agreement, said certificates representing 37,721.624 shares of the stock of the National Bank of Kentucky, and recovery was had upon that basis. Banco never held stock in the National Bank of Kentucky, but several years after the date of the agreement purchased the trustees' participation certificates which had been issued under the agreement.

The agreement of April 22, 1927, provided for an advisory committee, which was at all times to be composed of the individuals who were then directors[1] of the Louisville Trust Company and of the National Bank of Kentucky, and certain powers of the trustees could be exercised only with the written consent of the advisory committee.

The trustees were vested with power to purchase all or part of the stock of any corporation engaged in a business similar to that of a bank or trust company; to raise the means for such purpose by the issuance of evidences of beneficial interests called par-

---

[1] The agreement provided that the committee might add "not more than three of the higher executive officers of each institution."

ticipation certificates; to sell any stock so purchased and to use the proceeds of such sale in several different ways by division among the certificate holders; and, when they received funds from the liquidation of any capital stock so purchased, they were authorized to distribute the same in a lawful manner. They were empowered to take any legal action appropriate for the increase or decrease of the capital stock of any corporation which might become a part of the trust estate. Likewise they were empowered to use any extra dividends in any lawful manner for the benefit of the trust estate. The above enumerated powers, however, were never exercised by the trustees, and in accordance with the terms of the agreement could not have been exercised, except with the written consent of the advisory committee, which was composed of the members of the board of directors of the National Bank of Kentucky and the Louisville Trust Company.

The only powers which were uncontrolled and unrestricted in the trustees were to receive and hold the stocks which came into their hands as one indivisible estate, to issue trustees' participation certificates therefor, to change the par value of the certificates, to receive dividends and pay them to the holders of the trustees' participation certificates, to sell and assign absolutely shares belonging to the trust estate to persons desiring to become directors of the bank, in their discretion to fix the price and terms of such sale, and to pay the expenses of the trust out of any funds coming into their hands.

Perhaps the most comprehensive paragraphs vesting power in said trustees were the following:

"(8) The Trustees shall have the right, and it shall be their duty subject only to the limitations herein prescribed, to exercise in the interest of the holders of Trustees' Participation Certificates, all of the powers of management and control over any corporation in which they shall hold stock, incident to the ownership of stock held by them hereunder, and their power shall include all rights as stockholders, in connection with any corporate purposes or functions whatever and shall authorize them to exercise all voting rights and rights of ownership over such stock in the election of directors or in the discharge of any other corporate functions.

"Provided, however, that the owner of record on the books of the Trustees of any Trustees' Participation Certificate, shall have the right by written directions to the Trustees given at least 5 days before the vote is to be cast, to instruct them how they shall vote in the corporate meetings such proportionate number of shares therein owned by the Trustees as the number of shares represented by the Trustees' Participation Certificate owned by such person giving such directions may bear to the total number of shares represented by outstanding Trustees' Participation Certificates and the Trustees shall vote such proportion of stock in accordance with such instructions."

The limitations prescribed in the agreement were those which resulted from the powers of the advisory committee and the proviso of the agreement just quoted.

It appears from a review of the provisions of the contract that the absolute powers vested in the trustees were very limited, and that, if certificate holders desired to act under the proviso of the contract, they might by direction to the trustees elect the directors of the bank and of the trust company, who would in turn compose the advisory committee, upon whose written instructions alone the trustees could exercise important powers vested in them by the contract.

In the execution of the contract, however, the trustees voted the bank shares; exercised full control over them; and drew all dividends from the bank that were paid on the shares. All dividends received were paid over to the holders of the trustees' participation certificates. The trustees elected the directors of the bank, and did whatever else was necessary to be done by bank shareholders.

The directors of Banco were all directors of the Louisville Trust Company and of the National Bank of Kentucky. The trustees were directors either in the Louisville Trust Company or National Bank of Kentucky, or both, and were also directors of Banco.

The agreement provided that a holder of trustees' participation certificates should be "subject to the same liability thereon as he would have been subject to in case he had been the owner of record of such proportionate part of the shares held by the Trustees in any corporation as the number of shares called for by his Trustees' Participation Certificate bears to the whole number of shares covered by all outstanding Trustees' Participation Certificates. * * * The measure of liability assumed hereunder shall be the same as that provided by law with reference to the holders of such stock in any particular corporation in which the Trustees may hold stock as is provided by law with reference to the holders of such stock, and no more."

The Louisville Trust Company was designated as transfer agent for the transfer of

trustees' participation certificates, and the National Bank of Kentucky was designated as registrar. The agreement provided the form in which trustees' participation certificates should be issued. Each certificate referred to the agreement of April 22, 1927, and carried on its face the following legend: "This certificate is issued under the terms of the aforesaid agreement, and the holder hereof, by accepting the same, consents to and accepts the terms as fully as if written in."

At all times the National Bank of Kentucky kept at its place of business a record giving the names of trustees' participation certificate holders, and the amounts for which certificates were held by them. The bank list showed the number and amount of certificates held by Banco. Certificates of stock deposited with the trustees were transferred to and stood on the books of the bank in the name of "The Trustees Under Stockholders' Agreement of April 22, 1927."

A receiver was also appointed for the Louisville Trust Company, and the statutory liability was assessed against its stockholders. The trust estate had no property or funds other than the stocks of the National Bank of Kentucky and the Louisville Trust Company.

■■ The sole question for determination is whether Banco is liable to respond as a stockholder in the National Bank of Kentucky as the real and beneficial owner of the stock under title 12 USCA § 64,[2] or whether it is exempt from liability under title 12 USCA § 66.[3] Banco claimed that there was no liability against it, and that under section 66 only funds in the hands of the trustees were liable.

We may assume that in the case of a strict trust, in the absence of a statute or an express agreement to the contrary, the trustee, Taylor v. Davis, 110 U. S. 330, 334, 335, 4 S. Ct. 147, 28 L. Ed. 163; Heiden v. Cremin

(C. C. A. 8) 66 F.(2d) 943, 944,[4] and not the beneficiary is liable for individual liability assessed against stockholders. Banco's difficulty, we think, is that it contracted away any nonliability or exemption as a beneficiary. There is no merit in its claim that it assumed no liability because it did not sign the contract of April 22, 1927. Contractual liability under a written agreement may be assumed without such formality.

In Cau v. Texas & Pacific R. Co., 194 U. S. 427, 431, 24 S. Ct. 663, 48 L. Ed. 1053, it was held that a bill of lading limiting liability constitutes a contract between the carrier and the shipper, and knowledge of the contents by the shipper will be presumed. In Western Union Telegraph Co. v. Esteve Brothers & Co., 256 U. S. 566, 570, 41 S. Ct. 584, 65 L. Ed. 1094, it was held that the assent by the sender to a limitation of liability is ordinarily established if the telegraphic message is written upon one of the company's blanks, and in American Railway Express Co. v. Lindenburg, 260 U. S. 584, 43 S. Ct. 206, 67 L. Ed. 414, it was held that the shipper, by receiving and acting upon the receipt of the express company, although the same was signed only by the latter, assented to the terms of the receipt, and the same became the written agreement of the parties.

In Jennings v. Bank of California, 79 Cal. 323, 21 P. 852, 5 L. R. A. 233, 12 Am. St. Rep. 145, it was held that the acceptance without objection of a certificate of stock of a bank, which contained upon its face a condition, was an acceptance of such condition. To the same effect see New England Trust Co. v. Abbott, 162 Mass. 148, 38 N. E. 432, 27 L. R. A. 271; Sellers v. Greer, 172 Ill. 549, 50 N. E. 246, 40 L. R. A. 589, and Fidelity &. C. Co. v. Fresno Flume & I. Co., 161 Cal. 466, 119 P. 646, 37 L. R. A. (N. S.) 322. The general rule was recognized by the Court of Appeals of Kentucky in Bowen v. Chenoa-

---

[2] Title 12 USCA, § 64: "The stockholders of every national banking association shall be held individually responsible for all contracts, debts, and engagements of such association, each to the amount of his stock therein, at the par value thereof in addition to the amount invested in such stock. * * *"

[3] Title 12 USCA § 66: "Persons holding stock as executors, administrators, guardians, or trustees, shall not be personally subject to any liabilities as stockholders; but the estates and funds in their hands shall be liable in like manner and to the same extent as the testator, intestate, ward, or person interested in such trust

funds would be, if living and competent to act and hold the stock in his own name. (R. S. § 5152.)"

[4] See, generally, 1 Machen on Corporations, § 767; 1 Cook on Corporations (8th Ed.) §§ 245–246, and articles by Mr. (now Justice) Louis D. Brandeis (1881) 15 Am. Law Rev. 448, Mr. (now Justice) Harlan F. Stone (1922), 22 Col. Law Rev. 527, and Austin W. Scott (1915), 28 Harv. Law Rev. 725; Restatement, Law of Trusts, Tentative Draft No. 4, § 254, pp. 148 and 247, § 257, pp. 155 and 255. As to the liability of a beneficiary sui juris to a trustee who has paid calls, see Hardoon v. Belilios, [1901] A. C. 118, 123.

Hignite Coal Co., 168 Ky. 588, 592, 182 S. W. 635.

The assumption of liability here is clear; the certificates in express terms provided that, "by accepting the same," the holder "consents to and adopts said terms" of the contract of April 22, 1927. The liability of a holder of a certificate was to be measured by the liability provided "by law with reference to the holders of stock in any particular corporation in which the trustee may hold stock as if provided by law with reference to the holders of such stock." The stockholder's double liability is not contractual, but is imposed by statute as an incident of ownership. Christopher v. Norvell, 201 U. S. 216, 26 S. Ct. 502, 50 L. Ed. 732, 5 Ann. Cas. 740. Having thus assumed liability, Banco could not claim the immunity or exemption provided by title 12 USCA § 66, or of the law in the absence of the statute.

The agreement further provided that the trustees should certify to the National Bank of Kentucky a copy of the trustees' register giving the names and addresses of the holders of trustees' participation certificates and any change as to such holding. Presumably, such certification was to be made in compliance with title 12 USCA § 62, which provides that national banking associations shall at all times keep a full and correct list of the names and addresses of all shareholders and the number of shares held by each, and that such list shall at all times be subject to inspection of creditors of the association. As stated by Mr. Justice Harlan in Pauly v. State Loan, etc., Co., 165 U. S. 606, 621, 17 S. Ct. 465, 471, 41 L. Ed. 844: "Manifestly, one, if not the principal, object of this requirement, was to give creditors of the association, * * * information as to the shareholders upon whom, if the association becomes insolvent, will rest the individual liability for its contracts, debts, and engagements."

Casual inquiry would have disclosed to any creditor the terms of the contract of April 22, 1927, including the provision for the payment of double liability. The law presumes that creditors, in extending credit to national banks, take into consideration the double liability which may be assessed in case of insolvency, and they are treated for that purpose as if they had made an actual inspection of the records of the bank (compare Tourtelot v. Stolteben [C. C.] 101 F. 362),

and as if they had extended credit in reliance on the solvency of the shareholders whose names appear upon the books of the bank. See Benedict v. Anderson, Receiver (C. C. A. 6) 70 F.(2d) 227, decided April 13, 1934.

Under this section, also, the officers of the bank are required upon the first Monday of July of each year to transmit a list of the shareholders of the bank, verified by oath, to the Comptroller of the Currency. As we have seen, the bank list showed that the stock of the bank stood in the name of "The Trustees Under the Agreement of April 22, 1927," and that Banco's name appeared as holder of trustees' participation certificates. We may assume that performance of this duty of the officers brought actual knowledge to the Comptroller of the Currency of the agreement to pay double liability.

Whether on principles of estoppel Banco would not be permitted to deny its liability, under the circumstances, even in the absence of direct assumption thereof, we need not inquire.[5]

To determine liability under section 64, the courts must disregard the forms of transactions and ascertain who is the real and beneficial holder of the stock. It has long been settled that the real and beneficial holder of bank stock is primarily liable for the double liability.

The case of Pauly v. State Loan & Trust Co., 165 U. S. 606, 17 S. Ct. 465, 41 L. Ed. 844, establishes the rule. In that case Mr. Justice Harlan reviewed all of the previous cases relating to the liability of shareholders, and one of the propositions announced was (page 619 of 165 U. S., 17 S. Ct. 465, 470): "The real owner of the shares of the capital stock of a national banking association may, in every case, be treated as a shareholder within the meaning of section 5151 (now title 12, Sec. 63)." There never has been any departure from this rule. So lately as Early v. Richardson, 280 U. S. 496, 499, 50 S. Ct. 176, 177, 74 L. Ed. 575, 69 A. L. R. 658, it was said: "That the actual owner of the stock may be held for the assessment, although his name does not appear upon the transfer books of the bank, is well settled."

A trust [Corker v. Soper, 53 F.(2d) 190 (C. C. A. 5), certiorari denied Corker v. Howard, 285 U. S. 540, 52 S. Ct. 313, 76 L. Ed.

5 See Federal Reserve Bank, etc., v. Crothers (C. C. A. 4) 289 F. 777, page 779, and cases cited; Annotation 64 A. L. R. 595, 601; Lyons v. Westwater (C. C. A. 3)

181 F. 681. Compare Peterson v. Tillinghast (C. C. A. 6) 192 F. 287, page 289, analyzing Rankin v. City National Bank, 208 U. S. 541, 28 S. Ct. 346, 52 L. Ed. 610.

933] may not be employed to evade double liability. It was said in Lewin on Trusts (13th Ed.) p. 113: "The court will not permit the system of trusts to be directed to any object that contravenes the policy of the law." In a learned article in 8 Quarterly Law Review, 220, 225, the author reaches the conclusion: "If, on the other hand, the so-called trustee is a mere nominee or 'dummy,' put forward for no other purpose but to screen the so-called cestui que trust from responsibility, the relation between them is that of principal and agent and the principal is liable." Quoted 1 Mechem on Agency (2d Ed.) p. 28, note 31.

And it was said in Pauly v. State Loan & Trust Co., supra, at page 623 of 165 U. S., 17 S. Ct. 465, 471: "The object of the statute is not to be defeated by the mere forms of transactions between shareholders and their creditors. The courts will look at the relations of parties as they actually are, or as, by reason of their conduct, they must be assumed to be, for the protection of creditors."

■ The evidence establishes that Banco was in every sense the true and beneficial owner of the national bank stock involved; the trustees holding only the bare legal title to the stock. Banco had a right to transfer the trustees' participation certificates of which it was the owner, and such transfer carried with it a proportionate part of the stock of the National Bank of Kentucky. Banco, upon written direction to the trustees, had a right at all times to vote; such right being based upon its proportionate holding of stock in the National Bank of Kentucky. Because of the interrelationship of the corporations and personnel of the various boards of directors, it was not necessary for it at any time to exercise this right. Banco had a right to receive, and did receive, dividends. The trustees had a right in the first instance to receive such dividends, but it was their duty to pay them over to the holders of the certificates. Banco had a right to subscribe for its proportionate part of the increase in the capital stock of any corporation whose stock was held in trust, and by its right to vote had full power to control the trustees so far as its own stock was concerned.

The petition and especially the evidence sustain recovery against Banco as the real and beneficial owner under section 64 of the National Banking Act (12 USCA). It was not necessary that the receiver rely upon Banco's agreement to pay the double liability. The allegations of the petition relating to such agreement were perhaps in the nature of anticipation of Banco's defense. However, had it been necessary to recover upon the provision of the contract assuming liability, the decisions of this court would permit such recovery. Maumee Valley Electric Co. v. City of Toledo (C. C. A. 6) 13 F.(2d) 98, certiorari denied 273 U. S. 717, 47 S. Ct. 109, 71 L. Ed. 856.[6] Kentucky Rock Asphalt Co. v. Fidelity & Cas. Co. (C. C. A. 6) 37 F.(2d) 279, 77 A. L. R. 4, relied upon by Banco, is not to the contrary. It was held in that case that the contract sued upon was not one for the benefit of a third party. Unless the agreement of April 22, 1927, was in part for the protection of the creditors of the bank, it was a mere nullity, which is not in accord with the intention of the original parties.

The trust established by the agreement of April 22, 1927, was a business trust created by the settlors, to whose rights Banco succeeded, for their own benefit. It was not the ordinary testamentary or living trust created for the benefit of third parties. We need not decide whether it was the kind or type of trust which was within the contemplation of Congress when it enacted section 66 of the National Banking Act. The point was not decided in Hubbell v. Houghton (C. C.) 86 F. 547, 552 (affirmed on other points, Houghton v. Hubbell [C. C. A. 1] 91 F. 453), the court observing: "Moreover, if we were compelled to consider the proposition, we should probably hold that the statute, so far as it relates to the status of stock held in trust, concerns only express and active trusts, where there is a probability of some estate to respond to the liability."[7]

---

[6] If such recovery could be had in equity only, that point was not presented to the court below. See Moon Motor Car Co. v. Moon (C. C. A. 8) 58 F.(2d) 90, 93, 94; Iberville, etc., Co. v. Monongahela Co. (C. C. A. 5) 168 F. 12, 17.

[7] National banks were first created by the Act of February 25, 1863, 12 Stat. 665. Third National Bank v. Buffalo German Insurance Co., 193 U. S. 581, 589, 24 S. Ct. 524, 48 L. Ed. 801. That act contained no provision corresponding to section 66. The act was repealed by the Act of June 3, 1864, 13 Stat. 102, 118. There being no national banks at that time, it was sought by the latter act to encourage state banks to reincorporate under the national banking law. Much of the stock of the state banks (some of which were not subject to double liability) was held by executors, administrators, guardians, and trustees. Apparently to encourage accept-

We find no error in that the court entered a judgment which included interest on interest which had accrued to the date of the judgment. We assume that in the final enforcement of the judgment interest will be computed on the amount of the original recovery with interest, to the date of payment of the judgment, without intervening rests. See, also, Hawkins v. Glenn, 131 U. S. 319, 335, 9 S. Ct. 739, 33 L. Ed. 184.

The judgment of the District Court is affirmed.

ance of national banking charters, Congress exempted from double liability (section 12, 13 Stat. p. 103), state banks having capital of not less than $5,000,000 and a surplus of 20 per cent. on hand, and further enacted section 66. The latter statute has never been changed, although section 12 (now Tit. 12 USCA § 64) has been strengthened by providing that holders who transfer their stock within 60 days next before the date of the failure of a bank or with knowledge of such impending failure may not escape double liability except to the extent that the same is met by the subsequent transferee. Act of December 23, 1913, 38 Stat. 251. See The Congressional Globe, 38th Congress, 1st Session. p. 1257 (March 23, 1864), pp. 1341, 1342 (March 29, 1864), pp. 1396–1400

